187 P.2d 527

**WEBSTER v. POTLATCH FORESTS, Inc.**

No. 7391.

Supreme Court of Idaho.

Dec. 12, 1947.

Elder & Elder and Sidney E. Smith, all of Coeur d'Alene, for appellant.

HOLDEN, Justice.

This is an appeal from the Industrial Accident Board affirming the decision of the appeals examiner awarding benefits under the Unemployment Compensation Law.

It appears claimant had been in the sawmill business for twenty-six years prior to his discharge from Potlatch Forests, Inc., the last nineteen of which had been spent in the Clearwater mill of appellant located at Lewiston, Idaho. Prior to claimant's discharge, which occurred August 21, 1946, ap-

**4**

pellant installed on the "rig" operated by claimant, a new system of controlling saw guides. The new system consisted of an electrical device which permitted the sawyer to control the saw guide by electrically controlled buttons placed on top of the levers operated by the sawyer. Prior to the installation of the electrical control the saw guide was raised and lowered at the direction of the sawyer by the tail sawyer, and at the time of the installation of the electrical device claimant was head sawyer.

Following his discharge claimant filed an initial claim for unemployment compensation benefits. Later, to wit, August 28, 1946, an initial determination was made by the claims examiner for the Unemployment Compensation Division holding "claimant to be entitled, if otherwise eligible, to a weekly benefit amount of $18 up to a total amounting to $306", benefit year to begin August 22, 1946. September 28, 1946, appellant requested a redetermination, whereupon the claims examiner, October 3, 1946, reversed his initial determination and held claimant to be ineligible to receive benefits by reason of his having been "Discharged for misconduct *in connection* with employment", with the following remark added: "Refused to operate new electrical saw guides. Suggest claimant appeal."

October 10, 1946, claimant appealed to the appeals examiner. December 5, 1946, a hearing was had before such examiner. January 1, 1947, the appeals examiner decided claimant's actions were not to be deemed misconduct and, therefore, claimant should be paid benefits for those weeks for which he had filed claims. Thereafter, to wit, February 24, 1947, appellant filed a claim for review by the Unemployment Compensation Division of the Industrial Accident Board. March 21, 1947, the matter was heard. June 26, 1947, the Board made and filed its findings of fact and conclusions of law and entered thereon the following order: "Wherefore, it is hereby ordered that the decision of the Appeals Examiner, W. Clyde Williams, rendered and approved January 1, 1947, holding the claimant, Rome Webster, to be eligible to receive benefits be and the same is hereby affirmed."

The appeal to this court is from the above quoted order.

Appellant contends the Board's "Findings of Fact, Conclusions of Law and Order are not supported by substantial, competent evidence and should be set aside and annulled." Therefore, we turn to the record, where it appears the following testimony was adduced at the hearing before the Board.

Claimant testified on direct examination:

"Q. Will you state your full name, please? A. Rome Webster.

"Q. And how old are you, Mr. Webster? A. I am 57 years old.

"Q. And have you been working for Potlatch Forests? A. Yes, Sir.

"Q. How long have you worked for Potlatch Forests? A. I have worked for Potlatch Forests, that is this plant here, nineteen years and a couple of weeks. Since August 5, 1927, I think.

"Q. Just go ahead and explain—tell us how it is you feel you don't like the new so-called change. A. The reason I don't like it is that it is a very big job—those carriages are steam driven and they have valve controls which are very sensitive, and you have got to watch every move,—you've got to keep your eyes constantly on those things and that's why I don't want to take on extra duties. I'm afraid I will make a mistake and hurt somebody else or myself. I classify it is dangerous. It also keeps you from getting quality—watching the grades and the logs, you have to watch the log—trying to out-guess nature, and you can't do that and be bothered with a lot of other things.

\*    \*    \*    \*    \*    \*

"Q. In your years of experience, you have trained several tail operators, have you? A. Yes.

"Q. In your opinion, how long does it take to train a tail sawyer to do the job he was required to do before these new buttons were installed? A. Take a man that wanted the job and wanted to work, in a day and a half he could handle the job. If they don't want to work, they don't want to learn.

"Q. In your opinion, was the safety of all the men who are on the rig cutting these logs improved—that is, were their lives in less danger by the installation of these new buttons than before? A. Well, their lives were in more danger with the new buttons.

"Q. You felt it was not a safety measure? A. No, for this reason—if you want me to go on.

"Q. I want your reason. A. The sawyer is responsible for the setter and the tail-sawyer. You have to watch very closely not to catch the tail-sawyer and have a slab that would come in and the end come back and go through him. I have rammed them through the bandmill at the Potlatch Forests by trying to watch something else, run a slab through the bandmill,—that's what happens when you are trying to watch something else. The cleaner and the tail-sawyer is the man you have to watch. You have to see he sets it up properly and that it takes the lumber properly.

\*    \*    \*    \*    \*    \*

"Q. In discussing the installation of these new electric buttons, have you heard any of the sawyers make complaints? A. Yes.

"Q. Are their complaints the same as yours? A. The same as mine only some of them worse. Some see it worse than I do.

"Q. Did you ever at any time see a man—or have you ever heard a man say he liked the new operation? A. Not until this morning on the witness stand, except Mr. Peterson on the witness stand in the

former hearing. He said before he didn't like them,

    *     *     *     *     *     *

"Q. At the time Mr. Andrew asked you to use the saw, or to use the new guide buttons, what did you reply to him? A. I explained to him that I thought it was dangerous and that it would hamper production, and I was asking him how much more wages we would get for doing the extra work, and he said, none, and he went away. That is the first time, and then they installed the guide sometime a week or so afterwards. I don't know how many days, and so I tried to use it two or three times but it was bawling me up so badly I decided I would not use it that way for fear I would have an accident. Then he came in a second time and he asked me if I was going to use it and I said, not unless I get paid extra for it, and he said, all right, we will have to get someone else, and I said, all right, do as you like, but I am still getting out the work the way I hired out to do and the way I am getting paid to do.

    *     *     *     *     *     *

"Q. Why, instead of asking Mr. Andrew for an increase in wages because of the added burden that was thrust upon you, why didn't you ask for that through the union? A. I wasn't a member of the union, and I had understood by others that the union didn't care and wouldn't put up much of a fight for you unless you were a member of the union. I figured I had a perfect right to handle my own grievance. I didn't like to ask the union to fight for me when I didn't belong to them.

"Q. Did you understand at the time that the company was powerless to bargain with you? A. I always understood you could handle your own grievance if you wanted to."

On cross-examination claimant testified:

"Q. Would you have operated this rig with the electric guide if they had raised your wages? A. Well, I would have tried, but I didn't figure I could do as good as I did before, but I would have stayed if they had paid me.

"Q. Why didn't you try this for a week or two and find out whether it would work before you quit? A. Well, I did try it a few times and I just made up my mind it was extra work and I could see what it was going to be, and if I started in I would be like the rest of them and I wouldn't be like the rest of them.

"Q. And you wouldn't be paid the extra money? A. I wouldn't be paid.

    *     *     *     *     *     *

"Q. How many times did you operate this new device that Potlatch put in? A. Several different times and every time I tried—I pretty near caught the tail-sawyer twice in one day.

"Q. You wouldn't admit that being a sawyer, that you couldn't do it? A. Yes, I could do like the rest of them, but you

couldn't handle it like the company would expect you to and hold up your efficiency—I couldn't and no other man could.

"Q. If the company had paid you, you could? A. If they had paid me more money and would have been satisfied with what I gave them, I would have stayed, but I wouldn't promise them I would keep up the efficiency regardless of money because I couldn't.

"Q. Did you just flatly refuse to use the new guide unless they gave you more money? A. Yes, Sir.

"Q. Did Mr. Andrew try to talk you into trying to see if you could learn to like it? A. He tried to talk me into using it."

Dan Moss, a witness for respondent, testified:

"Q. Your name, please? A. Daniel O. Moss.

"Q. Where do you live? A. 1317—15th St.

"Q. And what is your occupation? A. Sawyer.

&ast; &ast; &ast; &ast; &ast; &ast;

"Q. Mr. Moss, in your experience and from your experience in sawing, and also from your experience in setting, and from your experience in performing the job of tail-sawyer, would you say that these new devices that have been installed, the electric button for the purpose of the sawyer, would you say that is an aid to the safety of those men? A. No, I wouldn't.

"Q. Why, wouldn't you say that? A. A sawyer has too much responsibility already, and to handle that, he can't do it and give the efficiency to the company that they expect, but if they would let me slow down to that speed where I could handle it, then it would be all right, but they won't do that. They are after you pretty nearly every day for more lumber—at least they were the last that I worked there, and that way I don't call it a help. You are endangering your crew. If you could go ahead and work like we did before,—you could see it yourself if you have worked a button on a nigger,—doing some other kind of work, it would take some time at least to get onto it. You have to look back to see whether your log is down in the loaders and before you know it you are pressing the wrong button and here will come the carriage back. It don't look right to me, but I never worked them so I couldn't say."

Albert Desilet, a witness for appellant, testified:

"Q. Will you state your name please? A. Albert Desilet.

"Q. Where do you work? A. Potlatch Forests, Inc., in the sawmill.

"Q. The Clearwater plant? A. Yes.

"Q. And what is your position? A. I am a sawyer on Number Five Rig.

&ast; &ast; &ast; &ast; &ast; &ast;

"Q. Did you operate Rig Number Number Five, or any rig in the Clearwater plant

prior to the time that the automatic guide setter was put in, at the time the tail-sawyer set the saw guide? A. Yes.

"Q. In your opinion as a sawyer, which is the best operation, the rig that has the automatic saw guide setter or the other that is set by the tail-sawyer? A. The one that has the automatic guide setter.

"Q. Will you tell us why? A. Because I think it is safer because I can operate the guide myself and don't have to depend on the tail-sawyer. It is also more convenient for me. I can lower the saw guide faster than the tail-sawyer, and, therefore, I can get into my speed quicker than if I had to wait upon the tail-sawyer to do it.

"Q. You are in favor of this operation then, where the sawyer operates the saw guide? A. Yes."

Blair Sebring, a witness for appellant, testified:

"Q. Will you state your name, please? A. Blair Sebring.

"Q. What is your position? A. Sawyer.

"Q. And whom do you work for? A. Potlatch Forests, Inc.

\* \* \* \* \* \*

"Q. What would you rather operate, a rig where the sawyer controls the guide or where the tail-sawyer does? A. Personally, I would rather have it the way it is,— to be controlled by myself.

"Q. Why? A. Because I know what I am going to do, and I don't know what the tail-sawyer would do until it was done. That's all there is to it."

On cross-examination, Mr. Sebring testified:

"Q. You say it is your honest opinion that it is safer to operate the saw guide from the sawyer's cage under this new device, rather than to leave it up to the tail-sawyer? A. That's my honest opinion.

"Q. Why is it safer? A. Because— you might liken it to a car, you know when you are driving your own car what you are doing with your controls, but you don't know what the other fellow is going to do with the controls. It is safer for you. When you operate it, you know where it is,—you can put it where you wish and you know it is going to be there.

"Q. Would you say the job of sawyer requires very much concentration? A. Yes, you have got to keep your mind and your eyes on your business.

"Q. Would you say, if you had any extra duties put on you that might take away some of your power of concentration that might otherwise exist? A. That would depend a great deal on the person.

"Q. You say it is safer for you to operate your guide yourself from the control button? A. Yes, it is for me.

"Q. How sensitive are the buttons? A. Just about as sensitive as a wall fixture—about on the same order.

"Q. Have you ever, in operating the saw, ever let the guide drop? A. I have let it drop pretty close.

"Q. In other words, there is still danger when the sawyer controls the guide? A. There may be some."

Shelton Andrew, a witness for appellant, testified on direct examination:

"Q. Will you state your name, please? A. Shelton Andrew.

"Q. Where do you work? A. Potlatch Forests in Lewiston.

"Q. What is your title? A. Superintendent of manufacturing and maintenance.

"Q. Do you have under your jurisdiction and control the Clearwater plant of the Potlatch Forests, Inc.? A. The sawmill operations and the pond.

"Q. How long have you worked for Potlatch Forests, Inc.? A. I worked for the Potlatch Lumber Company which was originally started in Potlatch in 1910 and I have worked since.

"Q. You have been working ever since? A. Except in the last year·

"Q. Have you been a sawyer? A. No.

\* \* \* \* \* \*

"Q. What rig next? A. Number One.

"Q. And that was the rig Rome Webster worked on? A. He was on one shift and Amos McConnell on the other.

"Q. What trouble did you run into? A· Mr. Webster refused to use it—to use the saw guide after it was applied.

"Q. Did you have a talk with him? A. I did.

"Q. What happened during that conversation? A. I went in and talked to him in the pit. He told the foreman prior to that that he wouldn't run it. The foreman talked to him. I went over and talked to him and told him we would put the buttons any place he wanted. That's all I asked him to do. He refused to do it. He said, I refuse to do it. I told the man if he wouldn't do it we would have to get somebody else in his place. He said, you will have to fire me, I won't quit. I went back once after that and tried to get him to reconsider. He didn't make any effort whatsoever to do it so we had another man there to take his place.

On cross-examination, the witness testified:

"Q. Mr. Andrew, was Mr. Webster classified as a head sawyer at the time of his discharge? A. That is correct.

"Q. Up until you had this little difficulty with Mr. Webster with regard to these new guide setters, had his work been satisfactory? A· He was a very capable sawyer when he so desired to be. ·

"Q. You mention that you did not actually consult with Mr. Webster to get his opinion on the installation of this new device before it was put in? A. That is right.

"Q. As I understand that, it was put in and he was ordered to try it? A. He was asked to try it. He was given all the chance in the world to try it and see what he could do with it.

"Q. If I understand your testimony, you said the principal reason for changing to the new method of operation was because you were having trouble with green tail sawyers. A. That is right.

"Q. And that it was a safety precaution? A. That was part of it.

*    *    *    *    *    *

"Mr. Oppenheim: You might as well ask the next question. Was there any discussion between you and Mr. Webster on the matter of additional compensation in any of the conversations? A. Yes, there was. When I went in and talked to him the first time he said, 'my thumb is stiff,' he said he couldn't operate it. He says, 'it isn't safe for the tail-sawyer or the setter.' He just said, no, absolutely he couldn't do it, and in the next breath he said, 'how much more money are you going to pay?'

*    *    *    *    *    *

"Q. Mr. Andrew, have you, yourself, ever operated a double cut saw? A. No.

"Q. You, yourself, don't know what a sawyer goes through as far as mental concentration and coordination are concerned, do you? A. I don't know how you would expect me to if I have never operated one.

"Q. That is right. You wouldn't know? A. No."

Connie Peterson, a witness for appellant, testified:

"Q. Will you state your name, please? A. Connie Peterson.

"Q. Where do you work? A. Potlatch Forests.

"Q. And what is your position down at the mill? A. Production foreman.

"Q. Is that foreman of the sawmill? A. Yes, Sir.

*    *    *    *    *    *

"Q. When did you start sawing? A. I started—I was in the A.E.F. two years, and I started sawing for Rutledge in 1920.

"Q. You have been sawing ever since? A. Except one year—I think that was in 1925.

"Q. And you sawed at the Clearwater Plant here? A. I sawed here the first day it started.

"Q. And you sawed until you took over the job of foreman of the sawmill? A. That's right."

On redirect examination Mr. Peterson testified:

"Q. Have any of the other sawyers complained to you about operating this automatic device? A. No, Sir.

"Q. Did any of them ever complain at the time they were installed? A. No, Sir."

David Troy, a witness for appellant, on direct examination testified:

"Q. Will you state your name, please? A. Dave Troy.

"Q. And your position with Potlatch Forests, Inc.? A. Manager of the Clearwater unit,—that is, the Lewiston mill.

"Q. Are you acquainted with Mr. Rome Webster, the claimant in this action? A. I am·

\*     \*     \*     \*     \*     \*

"Q. Are you acquainted with the operation of the sawmill as to the duties of the sawyer? A. I am.

"Q. Do you know what machine in your plant Rome Webster was working on at the time he was discharged? A. Number One.

"Q. Would you describe the duties of a sawyer on Number One machine? A. The log is placed on the deck that approaches the loading arms. There are chains that carry the log to the loading arms controlled by the deck man at the side in the cage.· The sawyer has three control buttons· One is operated by hand and one by foot. We like to keep the logs well up to the arms. On this particular rig they saw large logs. He leaves one space before the loading arms in case a rotten log comes up. The sawyer, when he comes back to the loading arms to get a fresh log, stops his carriage in front of the loading arms and kicks a log onto the arms. The setter, whom the sawyer is responsible for, is on the carriage itself. He places the knees, or the bumper of the knees back far enough to accommodate the size of the log and places the dogs that hold the log on the carriage into the log. The setter then adjusts the knees so that the first cut can be made. The sawyer advances the carriage towards the saw and operates the carriage forward and back against the saw. The saw is a double cut saw, cutting both ways. The sawyer also has another man that he is responsible for, and that is the tail-sawyer· He is about seven or eight feet to the left of the sawyer. He is out of sight of the sawyer. The tail-sawyer's duties are to handle the slabs, bark and any short pieces of waste material and dump them through a roll-away to the conveyer below. The tail-sawyer also operates the saw guide. The saw guide is a bar or piece of metal that the saw slides through which gives the saw more tension at the cutting point. It is necessary for the sawyer at all times to keep his eyes on the guide and the tail-sawyer regulates the saw guide to the position directly above the log. The sawyer also has other duties in his division. He has this lever that propels the carriage

back and forth. He has another lever that operates the nigger, the bar protruding to the front and used in turning the log. He has two bumpers that he moves the log forward with, and he—

"Q. Mr. Troy, you stated that the tail-sawyer operates the saw guide up and down? A. That is right.

\* \* \* \* \* \*

"A. During the war we had a lot of trouble getting tail-sawyers. Tail-sawing is not an easy job, and it pays just five cents more than common labor. For a long period of time we were putting in new men, putting in new tail-sawyers, and it so happened while on a trip to Burns, to the Edward Hines Lumber Company, I noticed they had a different system of controlling the saw guide, and also there, they eliminated the tail-sawyer entirely. On investigating, I found they had placed a button on the sawyer's sticks, one on each side the nigger stick and guide, to raise and lower the saw guide, to eliminate the tail-sawyer. When I came back I had the Assistant Superintendent go down and see it and we decided to change over. It was my idea we would eliminate the tail-sawyers, which we did. It also happened in Oregon to be a single rig, but in eliminating the tail-sawyer on the double saw, as ours is, we found it to be an improvement. We did pick up the idea of controlling the saw guide with the two buttons, to move the logs on the deck up to the loading arms on the nigger stick. That was taken off, and one for hand use and one for foot were put on —occasionally they use the foot. The two buttons that control the saw guide we put on the stick, thereby the tail-sawyer was not responsible to regulate the guide. It was the responsibility of the sawyer. The principal reason was because of green men we had to put on the tail-saw, and the danger connected with it. It was a safety move. And the second reason was for production. The sawyer would have to wait for the tail-sawyer in case the tail-sawyer forgot to raise the guide or lower it. They told me the operation of the saw guide by the sawyer became instinctive after a short while of using it.

"Q. You made the statement that the operation of the guide by the tail-sawyer was dangerous. Will you explain what you mean by that? A. It is dangerous in that the sawyer had to rely on the tail-sawyer as to whether the saw guide was placed at the proper level, and at that time we had new men and they did not know how to handle the saw guide. That would be true at any time because the tail-sawyer could forget to move the saw guide when it should be moved and the sawyer might bang into the saw guide, and if he was going ahead he would knock the saw guide from the saw. If he was coming back, he might break the saw and a man might be killed in such an operation."

On cross-examination Mr. Troy testified:

"Q. Mr. Troy, you understand you are dealing with laymen, especially with me. Maybe the Board is informed on terminology of the sawmill, but I think it is highly important that we understand what you are talking about when you are talking about the nigger, the rig and the deck and so forth. I wasn't exactly clear on your description of this thing. I believe there was one method of operation which the plant used for a good period of time before Mr. Webster's altercation with the company so that these different jobs, the new method of operation as far as the sawyer is concerned, is the thing that brought about the differences? A. That is right.

"Q. Will you explain what the difference was? A. It was entirely due to the changing of the handling of the saw guide. Instead of having the tail-sawyer handle the saw guide we asked the sawyer to handle it.

\*   \*   \*   \*   \*   \*

"Q. Mr. Troy, have you ever, yourself, operated a saw? A. Never.

"Q. You have never actually been in a sawyer's cage and felt the sensations the sawyer feels over these logs, have you? A. That is right.

"Q. Your work and your experience in the sawmill industry has been confined to shipping and selling, and work in the woods, —you have never operated a saw? A. I have never operated a saw, but my exper- ience has been all through the entire plant, not only shipping and selling."

As we understand appellant, it contends the findings, conclusions and order of the Board are not supported by substantial evidence, in this: That the evidence shows and the Board found claimant was guilty of insubordination and that "insubordination" of an employee "imports wilful disregard of express or implied directions and refusal to obey reasonable orders, and when established, warrants his discharge," citing Campion v. Boston & M. R. R., 269 Mass. 579, 169 N.E. 499 and Oehme v. Whittemore-Wright Co., 279 Mass. 558, 181 N.E. 733. Both are common law actions for the recovery of damages. Neither construed an unemployment compensation statute. In the Campion case the court held Campion could be discharged at any time the company no longer desired his services. If the company could do that, as the court held it could, it then became rather immaterial as to whether Campion was, or was not, guilty of insubordination, or as to what insubordination "imported". The Oehme case was a common law action on a contract to recover damages for the breach of the contract. It was not a proceeding to recover unemployment compensation, involving the construction of such a statute. These cases are not in point in the case at bar for the reason that whether claimant is, or is not, eligible for unemployment compensation, depends upon an inter-

pretation of the provisions of our Unemployment Compensation Law.

Furthermore, while the Board decided claimant was guilty of insubordination, it also decided such insubordination was not wholly attributable to claimant, and that brings us to a consideration of Sec. 43-2408 (Sess.Laws 1945, chap. 203, pp. 348, 356):

[Sec. 43-2408] "Personal Eligibility Conditions.—The personal eligibility conditions of a benefit claimant are that—

"(a) In accordance with the provisions of this Act, and such additional provisions, consistent therewith, as the Board shall, by regulations prescribe— * * *

"(b) * * *

"(c) * * *

"(d) * * *

"(e) His unemployment is not due to the fact that he left his last employment voluntarily without good cause connected with his employment, or that he was discharged for misconduct in connection with his employment: provided that if such separation from employment was not wholly attributable to the claimant, he may be determined to be eligible; and" * * *.

■ It seems to be quite clear from the provisions of subdivision "(e)", supra, the legislature intended a claimant would be entitled to unemployment compensation if his discharge or unemployment was not wholly attributable to his own conduct. But appellant insists, nevertheless, "it was not the intention of the Legislature that the personal eligibility clause of the Unemployment Compensation Law be interpreted as it has been by the Industrial Accident Board in holding that although Webster was guilty of insubordination, his discharge was not wholly attributable to himself. [because] The 1947 Session of the Idaho Legislature in enacting the Employment Security Law, deleted this particular clause from the personal eligibility qualifications."

It is true, as stated by appellant, the legislature did, in enacting the 1947 Employment Security Law, delete the clause under consideration, but it, nevertheless, expressly provided, as will presently appear, the old law (Session Laws 1945, chap. 203, p. 356) would remain in full force and effect until the effective date of the new law, to wit, July 1, 1947.

That session of the legislature enacted a rather comprehensive unemployment compensation law (Sess.Laws 1947, chap. 269, pp. 793, 843–845) known and to be cited as the "Employment Security Law". By section 79, it provided:

[Sec. 79] "Transition, Repeal, and Effective Date.—

"(a) As used in this section unless the context clearly requires otherwise—

"(1) 'Old law' means the Unemployment Compensation Law enacted under Chapter 12 of the Third Extraordinary Session of the Twenty-Third Session of the State Legislature, as amended by Chapters 9, 183, 187,

and 188 of the 1937 Session Laws, as amended by Chapters 202, 203, and 239 of the 1939 Session Laws, as amended by Chapters 65, 175, and 182 of the 1941 Session Laws, as amended by Chapters 29, 68, and 92 of the 1943 Session Laws as amended and compiled by Chapter 203 of the 1945 Session Laws;

"(2) 'New law' means the Employment Security Law as provided by this Act;

"(3) 'Effective date' means the date upon which the new law becomes effective.

"(b)    *    *    *

"(c)    *    *    *

"(d)    *    *    *

"(e)    *    *    *

"(f)    *    *    *

"(g) The old law, as defined in sub-section (a) (1) above, is hereby repealed, but shall remain in full force and effect until the effective date of the new law, and this Act shall in no way be construed as affecting or waiving any right accrued or penalty incurred under any provision of the old law.

"(h) Upon its passage and approval, this Act shall become effective on the first day of July, 1947."

As hereinbefore pointed out, the Board reviewed the decision of the appeals examiner March 21, 1947, and, further, it made and filed its findings of fact and conclusions of law and entered an order thereon affirming the decision of such examiner June 26, 1947. So that, the old "Unemployment Compensation Law" was still in full force and effect, under the express provisions of the 1947 Act, on the day the Board affirmed the decision of the appeals examiner. Furthermore, as will have been noticed, subdivision "(g)", above quoted, expressly provides the Act "shall in no way be construed as affecting or waiving any right accrued or penalty incurred under any provision of the old law."

In determining whether claimant, under all the facts and circumstances of this case, is entitled to unemployment compensation, it must be kept in mind "The Unemployment Compensation Law must be liberally construed to the end that its purposes be accomplished." Hagadone v. Kirkpatrick, 66 Idaho 55, 59, 154 P.2d 181, 182. And it must also be kept in mind: "The Board being the triers of fact was at liberty to believe or disbelieve any witness or number of witnesses. They heard the witnesses testify and observed their demeanor while testifying, and were therefore in a much better position to determine which of the witnesses was testifying truthfully or otherwise, than is the reviewing court."

Stroscheim v. Shay, 63 Idaho 360, 373, 120 P.2d 267, 272.

This court has uniformly held that where, as in the instant case, the facts and circumstances disclosed by the record "are such as might very well lead different minds

to reaching different conclusions upon the issue presented; and where such is the case, however meager the evidence, if it is of a substantial nature and character, the findings of the triers of fact should prevail." Cameron v. Bradley Mining Co., 66 Idaho 409, 415, 160 P.2d 461, 463; Jones v. Adams, 67 Idaho 402, 182 P.2d 963, 968; Smith v. Clearwater County, 65 Idaho 271, 278, 143 P.2d 561; Estate of Randall, 58 Idaho 143, 146, 70 P.2d 389; McKissick v. Oregon Short Line R. Co., 13 Idaho 195, 89 P. 629; Fleenor v. Oregon Short Line R. Co., 16 Idaho 781, 803, 102 P. 897; Denton v. City of Twin Falls, 54 Idaho 35, 43, 28 P.2d 202; Call v. City of Burley, 57 Idaho 58, 69, 62 P.2d 101.

"The employer and appellant, Potlatch Forests, Inc., has taken the position in this case that the refusal of the claimant, Rome Webster, to use and operate a new device installed by the employer, as well as his failure to take his grievance through the union to the employer was such insubordination as to constitute 'misconduct in connection with his employment' as that term is known and defined under the Unemployment Compensation Law, so that the claimant was not entitled to unemployment compensation benefits. The claimant and the Unemployment Compensation Division, on the other hand, has taken the position that although the company had the right to discharge the claimant for such failure and refusal the claimant's actions did not constitute 'misconduct' as that term was intended to apply with respect to the Unemployment Compensation Law." From which it clearly appears it was the position of appellants before the Board that claimant's alleged refusal to operate the new device installed by appellant, as well as his failure to take his grievance through the union, constituted such "misconduct in connection with his employment", within the meaning of the Unemployment Compensation Law, that claimant was not entitled to unemployment compensation benefits. And that, on the other hand, it was the position of claimant and the Unemployment Compensation Division, that claimant's actions did not constitute "misconduct" as that term was intended to apply with respect to the Unemployment Compensation Law.

This court will not consider or review a question as to whether claimant did, or did not, voluntarily leave his employment without good cause, or any other question, urged for the first time on appeal. This rule is subject to certain exceptions, not material here, for instance, a question of jurisdiction or an objection that a complaint does not state facts sufficient to constitute a cause of action (Sec. 5-611, I. C.A.).

We direct attention to Marysville Mercantile Co., Ltd., v. Home Insurance Co., 21 Idaho 377, 395, 121 P. 1026, 1033, where we held: "This court has so often held that it will not consider or review a question presented to this court for the first time, unless it be a question of ju-

risdiction, or that the pleading does not state a cause of action, that it seems almost unnecessary to cite the decisions, but the principle is well recognized in the following authorities" (citing cases).

Further, again, in Grant v. St. James Mining Co., Ltd., 33 Idaho 221, 222, 191 P. 359, we pointed out: "The rule is well settled that a party cannot avail himself of a defense for the first time in the appellate court, nor will a question not raised in the trial court be considered on appeal." Recent cases adhering to the rule are: Garrett Transfer etc., Co. v. Pfost, 54 Idaho 576, 585, 33 P.2d 743; Curtis v. Pfost, 53 Idaho 1, 21 P.2d 73; Johnson v. Diefendorf, 56 Idaho 620, 633, 57 P.2d 1068.

In conclusion: Appellant points out that "The National Labor Relations Act [29 U.S.C.A. § 151 et seq.] provides that a union designated or selected for the purpose of collective bargaining by a majority of the employees in a plant shall be the exclusive representative of all the employees in such plant in respect to rates of pay, wages, hours of employment or other conditions of employment."

It insists, therefore, "that if the claimant felt that the operation of the saw rig with the mechanical device installed justified a raise in his wages, there was a procedure for him to follow in the [collective] bargaining agreement".

And, further, appellant insists the union being the exclusive representative of all the employees in the mill, and claimant being bound by the collective bargaining agreement, even though not a member of the union, he should have followed the procedure fixed by such agreement. While claimant apparently concedes that to be true, still and nevertheless, failure to use the union, or the procedure provided by the union's collective bargaining agreement, could hardly be held to constitute such misconduct as to disqualify him from receiving unemployment compensation benefits.

It, therefore, follows from what has been said, the order appealed from must be affirmed, and it is so ordered.

GIVENS, MILLER and HYATT, JJ., concur.

BUDGE, Chief Justice (dissenting).

With all due respect to the conclusion reached by my associates in the above entitled cause, I am unable to concur.

In my opinion, the Unemployment Compensation Law is improperly applied to the facts of this case.

Section 43-2202, I.C.A. (Sess. Laws 1945, chap. 203, p. 348) provides, among other things: "As a guide to the interpretation and application of this Act, the public policy of this State is declared to be as follows: *Economic insecurity due to unemployment* is a serious menace to the health, morals and welfare of the people of this State. Involuntary unemployment is there-

18

fore a subject of national and state interest and concern which requires appropriate action to prevent its spread and to lighten its burden which now so often falls with crushing force upon the unemployed worker and his family. The achievement of social security requires protection against this greatest hazard of our economic life * * * and by the systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment, thus maintaining purchasing power and limiting the serious social consequences of poor relief assistance * * * for the compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed *through no fault of their own.*" (Emphasis added.)

Rome Webster was employed as a sawyer by the Potlatch Forests, Inc., at its sawmill at Lewiston. His employer, for the purpose of safety and to increase production, decided to install in the sawmill a different system of controlling the saw guides. This new system consisted of an electrical device which permitted the sawyer to control the saw guides by electrical control buttons placed on top of the levers operated by the sawyers. Prior to the installation of this electrical control the guides were raised and lowered at the discretion of the sawyer by the tail sawyer, usually an inexperienced man. The first electrical device was installed by appellant in its Potlatch plant at Potlatch. Approximately six to eight months later the first electrical control was installed in appellant's Clearwater plant at Lewiston; it was placed on saw rig No. 5. About ten months later an electrical control was placed on saw rig No. 2 in the Clearwater plant. . Thereafter appellant installed an electrical control on saw rig No. 1, which was the rig operated by Webster, and who was opposed to the installation of the electrical control device. It appears that sawyers in other mills where the electrical control had been installed were satisfied with the device, making no complaints, preferring it to the old system theretofore used.

As I read the record, when the electrical method of control was installed in the mill where Webster worked, he refused to operate the saw rig with the new device although efforts were made by the foreman and superintendent to persuade him to try it before absolutely refusing to continue in his employment. After much persuasion on the part of the foreman and the superintendent, Webster admitted that he could operate the saw with the electrical device, but he would not operate it unless he received additional compensation. He admitted he would have operated the saw rig provided he received additional compensation. No additional compensation being forthcoming, Webster's employment was terminated by another employee being substituted to operate the rig.

Certain testimony is extracted from the transcript and incorporated in the majority.

opinion, to a portion of which I call attention.

Upon direct examination claimant testified:

"Q. Just go ahead and explain—tell us how it is you feel you don't like the new so-called change. A. The reason I don't like it is that it is a very big job—those carriages are steam driven and they have valve controls which are very sensitive, and you have got to watch every move,—you've got to keep your eyes constantly on those things and that's why I don't want to take on extra duties. I'm afraid I will make a mistake and hurt somebody else or myself. I classify it as dangerous. * * *

"Q. At the time Mr. Andrew asked you to use the saw, or to use the new guide buttons, what did you reply to him? A. I explained to him that I thought it was dangerous and that it would hamper production, and *I was asking him how much more wages we would get for doing the extra work, and he said none,* * * * Then he came in a second time and he asked me if I was going to use it and I said, *not unless I get paid extra for it,* and he said, all right, we will have to get someone else, and I said, all right, do as you like, but I am still getting out the work the way I hired out to do and the way I am getting paid to do." (Emphasis added.)

On cross-examination claimant testified:

"Q. Would you have operated this rig with the electric guide if they had raised your wages? A. Well, I would have tried, but I didn't figure I could do as good as I did before, but I would have stayed if they had paid me. * * *

"Q. Did you just flatly refuse to use the new guide unless they gave you more money? A. Yes, sir.

"Q. Did Mr. Andrew try to talk you into trying to see if you could learn to like it? A. He tried to talk me into using it."

Shelton Andrew, witness for appellant, testified on direct examination, as follows:

"Q. What trouble did you run into? A. Mr. Webster refused to use it—to use the saw guide after it was applied.

"Q. Did you have a talk with him? A. I did.

"Q. What happened during that conversation? A. I went in and talked to him in the pit. He told the foreman prior to that that he wouldn't run it. The foreman talked to him. I went over and talked to him and told him we would put the buttons any place he wanted. That's all I asked him to do. He refused to do it. He said, I refuse to do it. I told the man if he wouldn't do it we would have to get somebody else in his place. He said, you will have to fire me, I won't quit. I went back once after that and tried to get him to reconsider. He didn't make any effort whatsoever, to do it so we had another man there to take his place."

On cross-examination this witness said: "A. * * * When I went in and talked

to him the first time he said, 'my thumb is stiff,' he said he couldn't operate it. He says, 'it isn't safe for the tail-sawyer or the setter.' He just said, no, absolutely he couldn't do it, and in the next breath he said, *'how much more money are you going to pay?'* " (Emphasis added.)

Mr. Peterson, a witness for appellant, testified on redirect examination: "Q. Have any of the other sawyers complained to you about operating this automatic device? A. No, sir."

As I view it, the pertinent question here is, did claimant voluntarily leave his employment without good cause, or was he discharged for misconduct or insubordination in connection with his employment, and was such separation from his employment not wholly attributable to claimant.

In my judgment there is no merit in the contention that claimant was discharged for misconduct or insubordination within the meaning or spirit of the Unemployment Compensation Law.

"Insubordinate" is defined in Funk & Wagnalls New Standard Dictionary as: Not subordinate or obedient; not submitting to authority; rebellious; mutinous.

"Insubordination" is defined as: The state of being insubordinate; disobedience to constituted authorities; unruliness.

Claimant simply refused to operate the electrical device because he thought it dangerous, and that it would hamper production, but would operate it provided he received additional compensation.

He left his employment for the reasons above indicated, which, I think, was without good cause, and not partly but wholly attributable to claimant. From the evidence I can reach no other conclusion than that claimant's discharge was wholly attributable to his own acts and conduct. This is clearly apparent from the fact that he stated he could operate the rig, but he would not operate it without additional compensation.

Unemployment legislation was enacted for the purpose of furnishing assistance to those unemployed due to no fault of their own. To deplete the fund, created by taxation, for any other purpose deprives the unemployed of necessary relief to which they are entitled to recieve.

In my judgment the majority opinion goes too far, in that it would operate against, rather than in favor of, the employee.

The order appealed from should be reversed, the cause remanded, and the proceedings dismissed.