397 P.2d 256

**Lois K. BOODRY, Claimant-Appellant,**

v.

**EDDY BAKERIES COMPANY, Inc., Last and Major Base Period Employer, Defendant-Respondent,**

and

**Employment Security Agency of the State of Idaho, Defendant-Respondent.**

**No. 9528.**

Supreme Court of Idaho.

Dec. 7, 1964.

Edith Anderson, Pocatello, for appellant.

Frank H. Powell, Counsel Employment Security Agency, Boise, for respondents.

KNUDSON, Chief Justice.

Although appellant, Lois K. Boodry, had worked for respondent Eddy Bakeries Company, Inc., during some periods prior to June 1963, her last period of employment was from June 1963 until she terminated it on November 29, 1963. In June 1963 her rating was that of a hand-packer, which rating she kept until about September 1, 1963, when her duties were changed to operating a bagging machine under the classification of wrapping machine helper and she then received a pay rate of $2.01 per hour. Under date of December 11, 1963 appellant filed her request for a determination of her status under the provisions of the Idaho Employment Security Law. Following a decision of the Chief Appeals Examiner for the Employment Security Agency holding that appellant left her employment voluntarily without good cause and was ineligible for benefits, appellant requested a review by the Industrial Accident Board (hereinafter referred to as Board), which was granted. Following a hearing on

review the Board entered its order affirming the decision of the Appeals Examiner and this appeal is from the order of said Board.

Appellant now relies principally upon three situations which she contends justified her quitting the employment, which are:

1. Employer's mistakes regarding overtime pay;
2. Disturbing incidents caused by employer's superintendent;
3. Appellant was entitled to a different classification and higher pay per hour than she received.

All of these complaints were not mentioned or referred to in her initial request for determination as reasons for termination of her employment. In appellant's initial petition, filed December 11, 1963, the only reason stated therein as to why she left her employment is as follows:

"3. I left work for the following reason: *Quit—not paid properly & had to fight to get the proper amount of check on numerous occasions. I consider this poor working conditions.*" (Italicized portion is handwritten.)

Appellant made no mention of any other reason for her termination until she filed her request for redetermination (January 7, 1963), wherein she claimed that she should have been receiving $2.12 instead of $2.01 per hour since May 1, 1963. In this request she also mentioned that mistakes had been

made regarding overtime pay which was due her but made no mention of any unpleasantry or difficulty in getting it corrected.

█ I.C. § 72–1366, which provides for the personal eligibility conditions of a benefit claimant under the employment security law of this state provides in part:

"Personal eligibility conditions.— The personal eligibility conditions of a benefit claimant are that—

\* \* \* \* \* \*

"(f) His unemployment is not due to the fact that he left his employment voluntarily without good cause, or that he was discharged for misconduct in connection with his employment \* \*."

In appeals such as is here involved the jurisdiction of this court is limited to a review of questions of law. I.C. § 72–1368(i). We shall consider appellant's contentions in the order hereinbefore listed.

The following excerpts from appellant's testimony disclose the basis for her complaint regarding overtime pay:

"Q. So—I see. Now would you like to tell me then just what occurred that caused your separation from your employment.

"A. Yes, for three weeks straight I had overtime coming to me, and it seemed like every week I had to go in to the manager, Bud Brown, and ask him why I was not gettin' paid for this overtime.

\* \* \* \* \* \*

"Q. I see. Well, now with respect to these three weeks that you said you didn't get your overtime, now when you got your check each week were you paid for your regular time only?

"A. Yes, and then there'd be—like if I'd get four hours of sumpin' on my time card then maybe they'd just pay me for an hour or sumpin' overtime, and then I'd have to go in and tell them that I was supposed to get more.

"Q. Um hmmm. And then what happened?

"A. Well, then eventually Bud would pay me.

"Q. I see. Well, was this simply rectified by showing him the time cards or \* \* \*

"A. Yes, he—After he'd figured up my time card, he'd pay me.

"Q. He paid you each time.

"A. Yes."

The record discloses that during the three-weeks period concerning which appellant claims to have had trouble regarding her overtime pay, she was, on one occasion, overpaid as a result of the number 47 having been misread as being 49. Concerning this complaint the Appeals Examiner found:

"The claimant was also dissatisfied because on two occasions an error was made with respect to her overtime. In

one instance both she and her supervisor erred in computing the amount of overtime due her. The final incident occurred on her day of separation when the claimant's check did not include overtime she had performed on the previous Saturday. The employer was willing to pay the overtime when it was brought to his attention, but the claimant, after an angry dispute with the superintendent, informed her employer that she was quitting.

\* \* \* \* \* \*

"On two occasions some error occurred with respect to the claimant's overtime. The employer paid her the overtime to which she was entitled when this was brought to his attention on the first occasion and was willing to do so. on the day of her separation."

■ After a complete review of the record we cannot view the problem appellant may have had regarding her overtime pay as being deliberately caused by anyone. Said finding is clearly supported by the evidence submitted.

■ The facts supporting appellant's complaint that she experienced disturbing incidents in connection with her work are not discussed in appellant's brief, however it being one of the circumstances allegedly contributing to or causing her to voluntarily quit, it shall be considered.

In this regard appellant testified:

"Q. Well, was there any particular reason that caused you to leave other than this matter of not getting your overtime pay?

"A. Yes, I don't think a—I don't think a superintendent has the right to threaten people every time he turns around.

"Q. Well, for example \* \* \* .

"A. Well, Jack Hall, every time you didn't do anything he wanted you to do just exactly, he always comes up with this little statement like, 'You're not indispensable', and that's just like a threat saying if you don't do such-and-such, we're going to get rid of you.

"Q. I see. This happened to you or did you just hear it?

"A. Yes, it's happened to me before.

"Q. On or about the time that you left your job?

"A. Well, I can't tell you the exact times he's done it because he's done it several times \* \* \*."

Appellant refers to such action on the part of the superintendent as creating "poor working conditions" which existed "just recently." There is no showing in the record disclosing the circumstances which existed when such statements were made to appellant. The testimony of appellant indicates that the remark was made during the time appellant was having problems concerning her overtime pay. Neither the Appeals

Examiner nor the Board made reference to this complaint in the findings, and in view of the conclusion reached it is evident that the claim of "poor working conditions" was considered to be without merit. A construction of "good cause" as used in I.C. § 72-1366 must not be extended to include purely personal and objective reasons which are unique to the employee—it must require that such cause is not a condition which by common knowledge is usual where accompanied by minor irritations. See Burroughs v. Employment Security Agency, 86 Idaho 412, 387 P.2d 473. If conduct on the part of the superintendent was in fact an important factor in bringing about a termination of her employment, the burden of establishing such was on appellant. It is clear that the showing herein made would not justify appellant in quitting her employment on the ground of unjust, or oppressive treatment by the superintendent or any officer of the employer.

The remaining contention of appellant is that she was entitled to a different classification and higher pay per hour than she received. Appellant was employed during June 1963 as a hand-packer for which she was being paid $1.86 per hour. During September 1963 she replaced a Mr. Moore as operator of the bagging machine and was given the rating of a wrapping machine helper, with pay at $2.01 per hour, which classification she held until she terminated. Appellant contends that she was then entitled to the classification of first wrapper with pay at $2.12 per hour.

The evidence discloses that the employer maintains two different machines which are used in the packaging of bread, one called a "wrapping machine", which, from roll stock, puts a wrapping around the bread; and another, "bagging machine", which opens a plastic bag while the operator pushes a loaf of bread into the bag. Charles O. Brown, manager of respondent employer, testified that the wrapping machine is much more complicated to operate. This testimony is uncontradicted. The operator thereof is given the classification of first-wrapper. It is appellant's contention that a first wrapper is an employee in control of or operating one of the machines, whether it be a wrapping or a bagging machine. She argues that she was able to operate the wrapping machine although she did testify as follows:

"* * * I *did* know how to operate it. I didn't know how to set up different things, but I could have done it in an emergency, but how was I supposed to go—learn how to set up that machine like an expert when they wouldn't give me a chance to get away from my bagger to break in somebody new? * * *"

Appellant's statement that she was able to operate the wrapping machine is disputed

by Manager Brown, who testified as follows:

"Q. Mr. Brown, it appears that the issue here is in regard to a bread wrapper and a bagger. Mrs. Boodry was classified as a bagger and was paid $2.01, is that right?

"A. That is correct.

"Q. Who was the wrapper?

"A. Her husband, John Boodry.

"Q. When he was away, would she wrap, on occasion? Did she know how to wrap?

"A. No, she did not—to my knowledge she never ran the wrapping machine by herself."

\*  \*  \*  \*  \*  \*

"Q. At any time to your knowledge was she doing the head wrapping job, or both jobs?

"A. No. In fact I told Lois when she took the job on the bagging machine when she questioned the first wrapper's wages, I said, Lois when you can run both machines, when you know how to run the wrapping machine, we will give you first wrapper's wages, but not until. We gave her the higher rate than the wrappers' helpers wages because she was very proficient at bagging bread, which is the job she was performing, and we felt she was worth the higher rate because she was good."

Employment at the bakery was carried on under a contract between the bakery and the American Bakery and Confectionery Workers Union, Local 393, AFL–CIO, of Pocatello, Idaho, which contract was admitted in evidence without objection. Appellant acknowledged that she discussed her classification with her union representative but that she did not receive support regarding her contention.

On this issue the Board correctly found that:

### "FINDINGS OF FACT

"The claimant's job was to insert loaves of bread into plastic bags using a bagging machine. Her classification was Wrapping Machine Operator Helper. When she was given the responsibility for operation of the bagging machine in September 1963, her pay was raised to $2.01 per hour from her previous rate of $1.86 per hour. Actually the rate of $2.01 per hour for the helper position did not, under union contract, become effective until 1965. The claimant contended that she should be given the title and pay of a Head Wrapper. The rate for this job is $2.12 per hour. The firm employs only one individual in this classification. This worker operates a wrapping machine which is more complicated than the bagging machine. He must be able to set up and change this machine when

necessary. The employer had no need for her to work at this position since he had a wrapping machine operator."

### "CONCLUSIONS

"The claimant was not performing the duties of a Head Wrapper and therefore the employer was under no obligation to give her the rate of pay attached to that job. She argues that the rate of $2.01 per hour was an incorrect rate for a Wrapping Machine Operator Helper and states that the current rate of pay for this position is $1.85 per hour. It appears that the employer generously gave her the higher rate in advance of the date at which this rate was to become effective."

The questions here involved, in the first instance, are questions of fact for the Industrial Accident Board, and its findings will not be disturbed on review when supported by substantial, competent evidence. Watts v. Employment Security Agency, 80 Idaho 529, 335 P.2d 533; Wolfgram v. Employment Security Agency, 77 Idaho 298, 291 P.2d 279.

On this appeal claimant admits that she left her employment voluntarily, but contends that she had shown good cause therefor. The burden of establishing eligibility for compensation benefits is placed upon the claimant whenever his claim to such benefits is questioned. Burroughs v. Employment Security Agency, 86 Idaho 412,

387 P.2d 473; Doran v. Employment Security Agency, 75 Idaho 94, 267 P.2d 628.

The findings of the Board are sustained by the evidence and the Board correctly ruled that the claimant left her employment voluntarily without good cause and is ineligible for benefits. Order affirmed. Costs to respondent.

McQUADE, McFADDEN, TAYLOR and SMITH, JJ., concur.