611 P.2d 1004

**Wyoma Sam FONG, Claimant-Appellant,**

v.

**JEROME SCHOOL DISTRICT NO. 261, Employer,**

**and**

**Department of Employment, Defendants-Respondents.**

No. 12900.

Supreme Court of Idaho.

July 18, 1979.

Louis Garbrecht, Twin Falls, for claimant-appellant.

R. LaVar Marsh, Donald L. Harris, Deputy Attys. Gen., Dept. of Employment, Boise, for defendant-respondent Dept. of Employment.

Frank M. Rettig, Jerome, for defendant-respondent Jerome School District No. 261.

SWANSTROM, Judge Pro Tem.

In the spring of 1977 appellant, Wyoma Sam Fong, was completing her second year of employment as a mathematics teacher at Jerome Junior High School. She had been a teacher for approximately ten years.

In April 1977, following complaints by some parents, the Superintendent of the Jerome School District learned that a few teachers employed by the school had given an unusually high percentage of failing grades. He learned from the State Department of Education that the statewide average failure rate was approximately 7%. Exclusive of the junior high school, the average failure rate in the district was 3%. He further learned that six to eight teach-

ers of the junior high school, out of approximately one hundred eighteen teachers within the district, had failure rates of over 15%, with some as high as 30%. The failure rate in the classes taught by appellant was approximately 30%.

As a result of this situation the Superintendent informed all teachers at the school at the start of the fourth quarter of the school year that thereafter they would be expected to have not more than a 7% failure rate, and they would be required to justify any failure rate exceeding that percentage.

At about the same time the teachers were asked to submit their letters of intent indicating whether they desired a teaching contract for the coming year. After some soul searching, Mrs. Fong declined to renew her teaching contract at the school for the coming year because she felt she could not conform to the newly announced guidelines without violating her own ethical and professional standards. After completing the school term she applied for unemployment benefits, which were denied on the grounds that she voluntarily and without good cause quit her employment.

Appellant submitted a claim to the Department of Employment for unemployment compensation benefits, which were denied. The matter went to an appeals examiner who conducted a hearing and denied the claim. Claimant appealed to the Industrial Commission and another hearing was conducted by a Referee to take additional testimony. Following that hearing the Commission entered Findings of Fact, Conclusions of Law and Order again denying the benefits which claimant sought, and claimant appealed to this Court. This Court affirms the lower court's findings.

Finding IV of the Industrial Commission was in part as follows:

"The claimant left because she did not believe she could ethically uphold the guidelines set by the school superintendent. However, it was reasonable for the claimant's employer to expect her to abide by a generally accepted failure rate or to be prepared to justify a higher rate in her classes."

Conclusion III of the Commission was as follows:

"The claimant voluntarily left her employment because she was unable or unwilling to justify the 30% failure rate of her students or to modify her grading standard to conform to the guidelines established by the school district administrator. These are personal reasons unique to the claimant and do not constitute good cause for leaving employment for the purpose of unemployment insurance eligibility. . . ."

The applicable provisions of the Employment Security Law, as it existed at the time of this controversy, are as follows:

"72–1366. Personal eligibility conditions. —The personal eligibility conditions of a benefit claimant are that—

.    .    .    .    .

(e) His unemployment is not due to the fact that he left his employment voluntarily without good cause, or that he was discharged for misconduct in connection with his employment.

.    .    .    .    .

(g) In determining for the purposes of this act, whether or not work is suitable for an individual, the degree of risk involved to his health, safety, morals, his physical fitness, experience, training, past earnings, length of unemployment and prospects for obtaining local employment in his customary occupation, the distance of the work from his residence, and other pertinent factors shall be considered. No employment shall, in any event, be deemed suitable and benefits shall not be denied to any otherwise eligible individual for refusing to accept new work or to hold himself available for work under any of the following conditions:

.    .    .    .    .

(2) If the wages, hours, or other conditions of the work offered are substantially less favorable to the individual than those prevailing for similar work in the locality of the work offered;

.    .    .    .    .."

Appellant contends that the school district sought to impose requirements upon her that violated her professional and ethical standards, and this gave her good cause to quit. She further alleges the new standards created a substantial change in the conditions of her employment, making her work "unsuitable." That these were "compelling and necessitous circumstances" which caused her to quit, and therefore her decision to quit was not voluntary.

■ The issue is whether Mrs. Fong quit her employment "voluntarily" and "without good cause." This Court has set forth the proper nature and scope of good cause in *Burroughs v. Employment Security Agency*, 86 Idaho 412, 387 P.2d 473 (1963), as follows:

"In order to constitute good cause, the circumstances which compel the decision to leave employment must be real, not imaginary, substantial not trifling, and reasonable, not whimsical; there must be some compulsion produced by extraneous and necessitous circumstances. The standard of what constitutes good cause is the standard of reasonableness as applied to the average man or woman, and not to the supersensitive; . . . ."

The case of *Broody v. Eddy Bakeries Co.*, 88 Idaho 165, 397 P.2d 256 (1964) followed with this language:

"A construction of 'good cause' as used in I.C. § 72–1366 must not be extended to include purely personal and [subjective] reasons which are unique to the employee—it must require that such cause is not a condition which by common knowledge is usual where accompanied by minor irritations. See *Burroughs v. Employment Security Agency*, 86 Idaho 412, 387 P.2d 473."

We have recently held that the "purely personal and subjective" language in *Boodry* has been used as a shorthand of sorts in some cases, but the test to determine whether good cause is present continues to be whether a reasonable person would consider the circumstances resulting in a claimant's unemployment to be real, substantial, and compelling. *See Meyer v. Skyline Mo-*

*bile Homes and Department of Employment*, 99 Idaho 77, 589 P.2d 89 (1979).

Appellant contends she left her employment for good cause because the directive of the superintendent violated her own professional and ethical standards. Appellant contends she could not morally and ethically agree in advance to limiting her failure rate to 7%, and her only reasonable alternative was to quit her employment.

The evidence taken at the hearing shows that when the excessive rate at the junior high became known a committee of teachers was appointed to look into possible causes. Toward the end of the school year in 1977 the committee came up with a list of thirty-one factors, which appellant contends contributed to the poor performance of the students and which had nothing to do with her teaching methods or grading standards. Appellant introduced this list to show that ". . . there were other problems in the school that was causing a high failure rate . . . and that the teachers at the end of the quarter were trying to bring out in hopes that it would lower the failure rate." The list suggested such causes as: poor administration, lack of a standard grading policy, no teacher orientation, lack of discipline, absence of a school principal for several months, lack of student motivation, problem with absences because of athletic events, etc.

The paper issued by the committee was intended to help the administration and teachers in improving conditions at the school, but it was too late in the school year to implement their suggestions. It is obvious that many of the causes listed by the committee of teachers were beyond the control of the individual students at the school. It follows that individual students should not have to pay the price of excessive failure rates caused by such factors that were beyond their control. The administration, upon learning of the excessive failure rate, was justified in imposing a standard that was considered normal for the state. If such factors affected the performance of some of the students in appellant's classes, and throughout the school as suggested by

appellant, then in fairness to the students it was reasonable for the administration, while trying to find and recognize the problems and to deal with them, to declare a moratorium on excessive failure rates by requiring all teachers to be prepared to justify higher than normal failure rates. The standard was neither arbitrary nor discriminative; it applied to all of the teachers in the district, not just to appellant.

Appellant was fearful that she would not be able to justify her own standards and reasons for passing or failing students. Appellant was told she would not be able to rely merely on her grade book for justification of a higher failure rate. Appellant stated she made it a practice to return student's papers after grading, and that she had only her grade book for justification for her grading.

However, the evidence shows the policy announced by the administrator applied only prospectively. There were a number of alternatives available to appellant, besides quitting her job. If appellant had good reasons for flunking more than 7% of her students, and those reasons pertained to a student's conduct, attitude, attendance, participation capability and the like, surely appellant would have been able to document and explain her reasons without relying solely upon her grade book, if she was called upon to justify her actions.

Without attempting to deal with the problem by learning what procedures and criteria might be acceptable by her employer, she quit her employment. In taking this precipitate action, she acted prematurely and without any real investigation into the conditions of her future employment, and she made herself ineligible for benefits. *Wolfgram v. Employment Security Agency*, 77 Idaho 298, 291 P.2d 279 (1955). *See also Rogers v. Trim House*, 99 Idaho 746, 751, 588 P.2d 945, 950 (1979).

██ We also cannot agree with appellant's argument that the imposition of the new standards created a substantial change in the conditions of her employment, making the work "unsuitable." The record made before the Industrial Commission fails to establish that any other teacher besides appellant felt the new standard was so onerous or unacceptable that it made the work unsuitable. The record fails to show that even one other teacher quit or declined to renew his contract because of it.

██ Appellant not only has the burden of showing that she quit employment for good cause, but she also has the burden of proving that the new conditions imposed by her employer rendered her job unsuitable. *Flynn v. Amfac Foods, Inc.*, 97 Idaho 768, 554 P.2d 946 (1976); *Wolfgram v. Employment Security Agency, supra.*

Since the average failure rate in the district was only 3%, exclusive of a small number of teachers in the junior high school, it does not appear arbitrary or unreasonable for the employer to place the burden of justification upon the teacher for a failure rate in excess of 7%. In appellant's case, her failure rate was ten times the average of the district.

In the hearings before the Administrative Agency appellant made no claim that the superintendent lacked authority from the Board of Trustees to issue the new grading policy. Appellant does raise the issue on appeal. She concedes the School District Trustees had the authority to enact the policy but argues that there is nothing in the record showing the School Board authorized the announced policy.

██ Since the issue of the authority of the Superintendent to implement the policy was not raised by appellant at the previous hearings, it will not be considered by this Court on appeal. *Webster v. Potlatch Forest, Inc.*, 68 Idaho 1, 187 P.2d 527 (1947).

Because of our disposition of this case we need not reach the issue of whether claimant is entitled to attorney fees.

DONALDSON, C. J., SHEPARD and BISTLINE, JJ., and THOMAS, J. Pro Tem., concur.