712 P.2d 1161

Rita CARLSON, SSA 198 26 6414,
Claimant-Appellant,

v.

CENTER OF RESOURCES FOR
INDEPENDENT PEOPLE,
Employer-Respondent,

and

State of Idaho, Department of
Employment, Respondent.

No. 15080.

Supreme Court of Idaho.

Oct. 22, 1984.

Rehearing Granted April 9, 1985.

On Rehearing Dec. 11, 1985.

Rita Carlson, pro se.

Jim Jones, Atty. Gen., Lynn E. Thomas, Sol. Gen., and Larry F. Weeks, Deputy Atty. Gen., Boise, for respondent Department of Employment.

PER CURIAM.

Claimant Rita Carlson appeals from the Industrial Commission's order denying her request for unemployment compensation. The commission found that claimant had voluntarily left her employment and was ineligible, by virtue of I.C. § 72–1366(c), to collect unemployment benefits. We affirm.

Claimant voluntarily left her clerical job with the employer herein, Center of Resources for Independent People, in order to move to California to live with her spouse. She applied for unemployment compensation, and her request for benefits was denied by the Department of Employment and in turn by the appeals examiner. The Industrial Commission reviewed the record and found the examiner's decision to be supported by substantial, competent evidence, and the commission therefore affirmed the denial of benefits.

On appeal, claimant asserts that her decision to terminate her employment was one of necessity and not one of convenience. She states that, during the 14 months she worked for respondent, her husband was unable to find work; that her husband left Idaho to take a job in California; that the fact of her and her two sons being here while her husband lived in California had a divisive and stressful effect on their family life; and that their financial situation was such that it was essential that both spouses work. She says that her husband made more money than she, and that therefore it was reasonable for her to quit her job and move to California, where she has actively sought work.

I.C. § 72–1366(c) states that a claimant is eligible for unemployment benefits, provided that:

"Claimant's unemployment is not due to having voluntarily left work to marry, or to perform the customary duties of maintaining a household, or to leave the locale to live with a spouse. The provisions of this subsection shall not apply after a change in conditions whereby claimant has become the main support of self or immediate family."

The Industrial Commission determined that claimant had left her Pocatello location in order to be with her spouse and that therefore, under the above-quoted provision, she did not qualify for unemployment compensation. We agree. *See Pyeatt v. Idaho State University*, 98 Idaho 424, 565 P.2d 1381 (1977). We also agree with the commission's holding that claimant is not the main support of herself or of her immediate family, and we note that claimant is now without work, whereas her husband is earning more than the amount of claimant's previous salary.

Claimant's assertion that she is being discriminated against on the basis of her marital status was disposed of in *Pyeatt, supra*, wherein it was held that I.C. § 72–1366(e) does not constitute a violation of claimant's right to equal protection under the state and federal law. We there noted that, "while the statute in question may in former times have discriminated as between the male and female, the statute in effect at the time in question here does not discriminate since it is worded in terms of 'spouse.'" *Pyeatt, supra*, 98 Idaho at 426, 565 P.2d at 1383.

The decision of the Industrial Commission is affirmed. No costs or attorney's fees on appeal.

## ON REHEARING

SHEPARD, Justice.

The opinion of the Court issued on October 22, 1984, affirmed the decision of the Industrial Commission denying claimant-appellant Carlson unemployment compensation. A petition for rehearing was granted. A majority of the Court continues to adhere to the original opinion of the Court.

DONALDSON, C.J., and BAKES, J., concur.

BISTLINE, Justice, dissenting.

When the Court's first opinion in this case was released, it appeared therefrom that basically all that we had for consideration was a replay of *Pyeatt v. Idaho State University*, 98 Idaho 424, 565 P.2d 1381 (1977); hence, I joined the opinion for the Court. Following the filing of claimant's petition for rehearing and upon involving myself with the record, I became wholly convinced that a rehearing should be granted, and further, that capable counsel should be requested to come to the aid of this claimant who has appeared *pro se* throughout this entire affair. My success was nil on gaining the votes necessary to seek counsel for the claimant, although the Court did that exact thing when a woman in trouble with the Idaho State Bar Commission could not retain counsel to represent her. *Idaho State Bar Commission v. Harrold*, Sup.Ct. No. 15514.

A review of I.C. § 72–1366(c) and the *Pyeatt* opinion brought me to the conclusion that able counsel could convince at least three members of this Court that *Pyeatt* is readily distinguishable from this

case on the facts, and/or, that the *Pyeatt* decision may have been wrongly premised on misconceptions as to what the legislature had actually enacted. Rita Carlson advised the Court that she was unable to come to Idaho for the oral argument on rehearing. As I surmised would happen, however, Larry Weeks of the Department of Employment legal staff presented what he believed to be her side of the issues in a rather commendable fashion considering that he very well might have surmised that he could write nothing and still prevail. Before discussing his views, however, it is more orderly to first mention my own views which were advanced to the Court and at least led to a rehearing.

*Pyeatt* involved a wife who wanted to be with her husband. *Both* were employed in Pocatello. That family unit did not include any children. All that appears is that:

> Pyeatt's husband ... was offered a promotion which evidently was contingent on Mr. Pyeatt's moving to Boise. He accepted the promotion and Mrs. Pyeatt terminated her employment in order to accompany her husband in the move to Boise. The parties tacitly agree there was no other cause or reason for the termination of Mrs. Pyeatt's employment at Idaho State university. Following the Pyeatts' move to Boise, Geraldine Pyeatt was unable to secure employment and filed for unemployment benefits.

*Pyeatt, supra,* 98 Idaho at 425, 565 P.2d 1381.

Claimant Rita Carlson well-demonstrated in her Notice of Appeal and brief, in her own language, that her factual situation is entirely different from that in *Pyeatt:*

> I feel that there is no comparison to my case and hers, because after reading the case history I can see where her spouse left his employment to go to another one in order to take advantage of a promotion. Ms. Geraldine Pyeatt was not the head of her household when she left her employment, *her husband did not have to leave the city of Pocatello, to support his family, because he did have employment,* it was their decision to

earn higher wages and these facts do not relate to my case no way at all. *My spouse was left no choice in his search for employment* to support his family, *because he tried for 14 months through out the entire state of Idaho to gain employment but every door was closed to him [for] reasons still unknown.* These records can be checked with the department of employment from the state of Idaho.

The Center of Resources for Independent People my former employers realized that this has caused me great hardships separating me from my spouse and separating his two teenage sons from their parents, at a time in their life in which they required both parents. They understood my dilema and let me leave with excellent references, in the hopes that I would be able to find employment here, but because of the high rate of unemployment and not having the skills, to acquire employment, because of my physical limitations this has not happened. I tried to find employment with an Independent living center here, but they do not have the funds to put anyone else on the payroll. They – – my former employers could not terminate me because I did not cause any reason for such action. This was stated to the appeals examiner by Miss Jeanne Whitmer my former employer.

The distinction is further evidenced by claimant's sworn testimony given from California via telephone before the Department's appeals examiner, together with that of claimant's employer, Jean Whitmar:

> [Examiner] Q. Will you tell me why you quit?
>
> [Claimant] A. I had to leave because my husband needed me here with him. We still have two teenage sons in school, and I felt that he needed my help. He needed my financial help and he needed my help as a mother. *He was out of work for fourteen months there in Idaho.* And we've run up very large expense from him being out of work, traveling back here to Califor-

nia three times, and *he was offered positions here in California, so he had to leave.* He left in July when his unemployment benefits ran out there in Idaho. So, he left in July to come here to look into the situations that he was offered. While he was here, *he was given a job and he took it.* And he was here for about a month, but he called and said that it was necessary for me to get here to be with him because school was starting, was going to open soon, and he felt that he, *it wasn't fair to the boys for parents to be separated,* for me to stay here and him there, and the boys being caught in between. *They had to go to school, so we felt it best for us all to be together, and besides that, we had such outstanding expenses because of him being unemployed for such a long time, that I have to find employment.* There's no way that I can just sit home here now because he's working. We are, *I have large medical expenses.* I have a permanent colostomy from cancer which requires me wearing medical supplies. I have extending expenses because of an accident that I had in 1980. I have to go to physical therapy three times a week, and I'll be under a doctor's care. And there's no way that my husband can support all of my needs and also raise the boys and catch up with all the expenses that we occurred from him being unemployed for fourteen months. *So, not only am I needed here to be a wife, which is probably third on the line, second a mother, and first, I have to help work. I have to work. It's a necessity.* It's not, it's not, *it's not just a luxury for me to go to work.*

Q. Ms. Carlson, when you were employed at the Center of Resources for Independent People, what was your salary?

A. I was earning $1000 a month.

Q. And since moving to California then, has your husband been continuously employed there?

A. Yes, he has.

Q. And his salary now?

A. $1500 a month.

Q. And you then have had the $300 earnings since going there?

A. That's just the last two weeks, which I, I had to put right back into car expense because I didn't have a car to get back and forth to work. In order to get my car working, I had to, I used the first two weeks salary. But I got told Friday at 4:00 that I had to be laid off because there wasn't enough work.

A. All right. I really have no additional questions to ask you. Do you have anything further you'd like to add?

A. Yes. I feel that I, even though I am in full realization that as it is written in the Idaho Law, and I feel that if I can't win this time, that I feel that it, the law is unfair. I feel that the law should be changed to meet the circumstances. I also feel that it's unfair to expect parents and children to be separated just so that we can collect our unemployment benefits. That's all I have to say.

Q. Ms. Whitmar, do you have any questions that you would like to ask Rita Carlson?

JEAN WHITMAR: No, I have none.

Q. I really have no questions to ask you. Do you have anything you'd like to add to the hearing at this point?

JEAN WHITMAR: I guess I would like to support the last statement of what Rita talked about, and I feel that her decision to, to leave this employment was a sound decision because in reality, her, you know, her marriage would have been broken up, and you know, it was, it was very sad for us to see her go. Her fourteen months here were very much appreciated and, you know, it was, it was very hard for me to see her leave. You know, I feel that her unemployment claim could help get them out of some of the financial diffi-

culties that they were having, even while they were here, and that, you know, her husband's reemployment in, in his chosen profession is, is really great. And when I was told that she was working, I was excited too. And I would just like to support the fact that I also think that the Idaho Code is, is very, very unfair to, to married persons at this point.

Q. All right. Anything additional that you would like to add before I close the hearing, Rita Carlson?

A. No. I thank everyone involved.

It cannot be disputed that claimant herself has established a controlling distinction between her case and that of Mrs. Pyeatt. Mrs. Pyeatt's husband did not become unemployed, but rather a marital decision was made that he would accept *better* employment in Boise, and she would go with him. No children were there involved. The Carlson family unit involved two teenage school children. The Pyeatt family unit only sought to improve what in all likelihood was already a comfortable financial status in the midst of a good economy. The Carlsons were destitute and impoverished, and the husband had fully exhausted all avenues of possible employment in a deteriorating economy. This Court in *Pyeatt* perhaps was correct in observing that in that record *compelling circumstances* for Mrs. Pyeatt to quit her good employment were not established.[1] That cannot be said in this case.

Just after the release of our opinion in this case, my interest in this case was deepened by a newspaper account of what appeared to be a similar case decided by the California Supreme Court—without a dissenting vote. The media account suggested that involved was a family relationship which was *not* a husband and wife, but two parents and their one child. Noting that difference, I find it appropriate and hopefully illuminating to point to some of the language found in that opinion—language which I think would be common to that which one would expect from every member of this Court, common to all of the states of this republic as well, and common to all civilized people:

> It is difficult to conceive of a more fundamental familial relationship than one which is created when two parents establish a home with their natural child.... This court has recognized that *"the family is the basic unit of our society, the center of the personal affections that ennoble and enrich human life. It channels biological drives that might otherwise become socially destructive; it ensures the care and education of children in a stable environment; it establishes continuity from one generation to another; it nurtures and develops the individual initiative that distinguishes a free people."* (De Burgh v. De Burgh (1952) 39 Cal.2d 858, 863, 864, [250 P.2d 598].)

*MacGregor v. Unemployment Insurance Appeals Board*, 37 Cal.3d 205, 207

---

1. The Court in *Pyeatt* said:

   Claimant-appellant asserts that her termination of employment was not voluntary since she had a compelling need and desire to maintain the family unit and avoid divorce, and thus she had no alternative but to terminate her job and move to Boise with her husband. In support of that argument, claimant-appellant provides no authority which we deem applicable. Her employment was terminated by her own free act for causes over which her employer obviously had no control and which had nothing to do with the conditions of her employment. They were purely personal and subjective reasons which were unique to the employee. *See, McMunn v. Dept. of Public Lands, supra* [94 Idaho 493, 491 P.2d 1265 (1971)].

*Pyeatt, supra,* 98 Idaho at 425, 565 P.2d at 1382.

And in *McMunn v. Department of Public Lands,* 94 Idaho 493, 495, 491 P.2d 1265, 1267 (1971), the Court said:

" 'Good cause' within the purview of our statute does not extend to purely personal and subjective reasons which are unique to the employee but embraces conditions other than those which by common knowledge are usual where accompanied by minor irritations." *Clark v. Bogus Basin Recreational Assoc, supra* [91 Idaho 916, 435 P.2d 256 (1967)]; *Boodry v. Eddy Bakeries Co.,* 88 Idaho 165, 397 P.2d 256 (1964).

Cal.Rptr. 823, 689 P.2d 453 (1984) (emphasis added).

Over thirty years ago, this Court, speaking through Chief Justice Taylor, approvingly quoted the above-italicized language from the then recent *De Burgh* case, going on to add in its own language:

> The family unit, constituting as it does the very base of our religious, cultural and moral life, is one of the principal supporting pillars of our civilization. The state, created by the people for the protection and promotion of their common welfare, must protect and foster marriage and the family relationship. *Howay v. Howay,* 74 Idaho 492, 500, 264 P.2d 691, 696 (1953).

*Howay* clearly made a declaration of public policy in Idaho. Whatever might be said as to a purely husband-wife situation, as in *Pyeatt,* does not hold true where the family unit includes two minor children. Nothing in I.C. § 72–1366(c) purports to address the situation *where the family unit includes two minor children who have every right to and should be reared under the guidance of a father and a mother.* The brief of the Department [2] argues at page 10 that claimant quit her job to join her spouse, from which springboard it is said places "the facts in this case squarely on point with the facts in *Pyeatt."* Respondent's Brief, p. 15. Such statement, however, does not withstand scrutiny, as has been pointed out.

Although it is abundantly clear to me that the legislature *did not at any time* intend to deny benefits to a spouse who for compelling reasons left employment *to join a spouse who was first forced to leave the locale by reason of being unemployed and in dire circumstances* [which is a far cry from the voluntary move described in the statute] that issue need not be here determined where the claimant's quit and move was to join a spouse who had been previously forced to leave, and thereby

keep intact the family unit—*a family unit that included two children!* In *MacGregor, supra,* even where the parents were not married, the California Supreme Court upheld the superior court's determination that where the first spouse to leave California had good cause for leaving, there to care for an ill and elderly father, *such was a compelling circumstance* which entitled the child's mother to also leave.

> The conclusion that MacGregor [the mother] had "such a cause as would, in a similar situation, reasonably motivate the average able-bodied and qualified worker to give up his or her employment with its certain wage rewards in order to enter the ranks of the unemployed" is entirely consistent with the laws and public policies of the State of California.

In sum, whatever may be said of *Pyeatt,* it simply cannot be said, as a matter of law, that Rita Carlson's giving up her job was a *voluntary* act within the provisions of I.C. § 72–1366(c):

> (c) Claimant's unemployment is not due to having *voluntarily* left work to marry, or to perform the customary duties of maintaining a household, or to leave the locale to live with a spouse. The provisions of this subsection shall not apply after a change in conditions whereby claimant has become the main support of self or immediate family. (Emphasis added.)

The record is an absolute that her husband was first *compelled* to leave, only after fourteen months of pounding the highways of all Idaho in search of employment. In turn, when he found steady employment in California, Rita Carlson's move to then join him, *with the children,* was in keeping with this Court's declaration of public policy, and was a second determination made under *compelling circumstances,* and hence that move was not within the purview of the provisions of I.C. § 72–1366(f). It was "voluntary" only in one sense, that

---

**2.** The brief then referred to was the Department's brief on the first hearing which led to our 1984 opinion. On our grant of rehearing, the Department has filed a further brief, reflect- ing an accurate surmise that the concerns raised by Rita Carlson's petition for rehearing motivated the granting of a rehearing.

being that no one put a gun to her head. That which is done under compelling circumstances cannot be said to have been voluntary. The decision to keep intact a family unit which included minor children could not at one and the same time be in the fulfillment of declared public policy (and hence compelling good cause), but also within § 72–1366(g)'s prohibition against voluntary conduct. Very recently, Justice Bakes, writing for a unanimous Court, brought to our attention the legislature's declaration of public policy in Idaho:

The Idaho Employment Security Act was enacted to address the problem of economic insecurity resulting from involuntary unemployment. The act provides "for the compulsory setting aside of unemployment reserves to be used for the benefits [sic] of persons unemployed through no fault of their own." I.C. § 72–1302.

*King v. Department of Employment,* Idaho (Sup.Ct. No. 15640, issued December 6, 1985).

*Pyeatt,* on the other hand, contains very loose language to the effect that "the legislature has sought to encourage *stability* of employment, I.C. § 72–1302(a)," what that section actually states in full is:

The public policy of this state is declared to be as follows: Economic insecurity due to unemployment is a serious menace to the health, morals and welfare of the people of this state. Involuntary unemployment is therefore a subject of national and state interest and concern which requires appropriate action to prevent its spread and to lighten its burden which now so often falls with crushing force upon the unemployed worker and his family. *The achievement of social security requires protection against this greatest hazard of our economic life. This can be provided by encouraging employers to provide more stable employment and by the systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment,* thus maintaining purchasing power and limiting the serious social consequences of poor

relief assistance. *The legislature, therefore, declares that, in its considered judgment, the public good, and the general welfare of the citizens of this state require* the enactment of this measure, under the police powers of the state, and for *the compulsory setting aside of unemployment reserves to be used for the benefits of persons unemployed* through no fault of their own. (Emphasis added.)

It is thus seen that this Court's paraphrasing language in *Pyeatt* more aptly would have been that the legislature recognized the many social ills of unemployment, and sought to alleviate those ills by encouraging stability on the part of employers—not employees. But, the most salient provision and which we there ignored, is *"and by the systematic accumulation of funds to provide benefits* for periods of unemployment .... to be used for ... persons unemployed through no fault of their own."

This case could have been correctly decided in 1984 had the justices of this Court, including myself, looked beyond the proposed opinion which we joined and taken heed *from the record* that this simply was not a *Pyeatt* case—not where the husband's leaving Idaho was not itself a voluntary act, as in *Pyeatt,* but done under the compelling circumstances of leaving the kennel and going hunting for employment, and had we taken heed that the family unit inclusive of two teenage boys was not within the proscription of § 72–1366(c). We could have then taken note that in *Pyeatt* we specified that we did not see *compelling* reasons for either Mr. Pyeatt's move to Boise, or Geraldine Pyeatt's leaving with him. And we could have had, should have had, a proper regard for the meanings of "fault," of "voluntary," and of "compelling"—all three of which words we so regularly deal with in a variety of legal contexts that resort to a dictionary would be thought unnecessary. Fault, of course, may consist of conduct which by omission or commission is unlawful, improper, unfair, contrary to rule or regulation, and perhaps even thought of as immoral. In the context of § 72–1366(c), the fault, how-

ever, is confined to doing voluntarily that which otherwise is ordinarily never considered fault in the true sense of the word. Although the Court did in *Pyeatt* rule out as a *compelling circumstance,* and hence not voluntary, Mrs. Pyeatt's leaving her employment in Pocatello to come with her husband who was voluntarily coming to Boise for a better position, as Rita Carlson pointed out, that was a family unit wholly unlike hers—her family unit not being proscribed by the legislature—as well it should not have been. And well it should not be by a majority of the Court who flies into the teeth of Idaho's public policy as declared earlier this Court, by the legislature in enacting the Employment Security Law, and, yea, even in our Constitution, where we find:

Preamble

We, the people of the state of Idaho, grateful to Almighty God for our freedom, to secure its blessings and promote our common welfare do establish this Constitution.

Somewhere along the line in recent years, it seems that this Court may have confused our common welfare, as the expression was used by the Framers of the Constitution and by the 1947 legislature, with the notion of supposedly undeserved handouts to undeserving persons. When an uncounselled Rita Carlson is denied benefits rightfully due her, the loss is Everyman's. When the common welfare is promoted, and when the legislature's declaration of the public policy behind the Employment Security Law is observed, Everyman prospers. Turning now to the two-sided presentation of the Department's argument, both in its newly filed brief, and at oral argument, as intimated above, the Department accurately anticipated that the rehearing was granted to consider the propositions that Rita Carlson had raised in her *pro se* petition for rehearing.

The Department is unable to determine what effect, if any, the presence of children in the marriage has on the ultimate legal effect of the statute. It should be noted that the statute in question pro-

vides in *Idaho Code* § 72–1366(c) that a claimant is eligible for benefits if "claimant's unemployment is not due to having voluntarily left work to marry, or *to perform the customary duties' of maintaining a household, or to leave the locale to live with a spouse....*"

Respondent's Brief on Rehearing, p. 6. The brief furnished the Court mentions similar cases from other jurisdictions, including the recent *MacGregor* case from California, that being the same case which was brought to my attention in a newspaper account. The brief also provides us with an abbreviated history of California legislative history:

Prior to 1976, the California statute was similar to Idaho's and provided as follows:

Notwithstanding any other provision of this division, an employee who leaves his or her employment to be married or to accompany his or her spouse to or join her or him at a place from which it is impractical to commute to such employment or whose marital or domestic duties cause him or her to resign from his or her employment shall not be eligible for unemployment insurance benefits for the duration of the ensuing period of unemployment and until he or she has secured bona fide employment subsequent to the date of such voluntary leaving.... (California Unemployment Insurance Code § 1264)

The above-quoted section was repealed by the California Legislature in 1976 at stats.1976 c. 1169, p. 5249, S. 1.

In 1982, the California legislature, in what appears to be a full reversal, of its previous enactment instituted the following entitlement to benefits in this situation:

An individual may be deemed to have left his or her most recent work with good cause if he or she leaves employment to accompany his or her spouse to a place from which it is impractical to commute to the employ-

ment. (California Unemployment Insurance Code § 1256, paragraph 4)

Respondent's Brief on Rehearing, p. 9. Following the foregoing, the Department's brief says of the *MacGregor* case:

[T]he issue before the Supreme Court of California was not whether leaving a position to accompany a spouse was a disqualifying element for unemployment benefits, but whether a voluntary quit of employment to accompany a person to whom the claimant was not married was also within the intent of the legislation. In *MacGregor*, the California Supreme Court held that the claimant was not disqualified for receiving unemployment insurance benefits under the above section when she accompanied the natural father of her child to New York state in order that the father could attend to family business. Obviously, this decision is totally unrelated to the type of statutory scheme present in Idaho.

Respondents' Brief on Rehearing, p. 10. It may be conceded that the two statutory schemes are different. But that is not the end of any meaningful discussion of *MacGregor*. Rita Carlson, her *husband*, and their two children are a family unit as family units have forever been recognized *in Idaho*. The big issue in *MacGregor* was not a *wife* leaving for another state in order to join a husband, but an unmarried woman and child leaving to join the unmarried man who was the child's father. Had the California "couple" been married, there would have been no *MacGregor* case.

There is much· in *MacGregor*, however, that has application here, none of which, however, has Department of Employment had the kindness to bring to the attention of the other members of the Court—other than they must get it from my effort. First of all, *MacGregor* relies rather extensively on its 1952 public policy language in *DeBurgh, supra,* which this Court immediately used, citing the California case. *Howay, supra.* Other highly appropriate language in *MacGregor* is as follows:

[T]he circumstances attendant upon a worker's decision to leave employment in order to accompany a spouse and family to a new home may be so *compelling* as to constitute good cause for quitting within section 1256.

*MacGregor, supra,* 698 P.2d at 456.

[Under California regulations on what constitutes compelling reasons to leave employment,] [i]n addition to obligations arising out of the existing or prospective marital status of the claimant, legal or moral obligations relating to the health, care, or welfare of the claimant's family, or to the exercise of parental control over a claimant who is an unemancipated minor may also give rise to a *voluntary leaving* with good cause.... *Compelling circumstances may be found where a minor child of the claimant requires care and supervision and there is no reasonable alternative....*

*Id.* at 457, n. 4.

"The Legislature's decision to give weight to marital relationships in the determination of 'good cause' supports public policy encouraging marriage and is a reasonable method of alleviating otherwise difficult problems of proof." ...

"The inevitable questions would include issues such as the factors deemed relevant, the length of the relationship, the parties' eventual plans as to marriage, and the sincerity of their beliefs as to whether they should every marry." ...

. . . .

... This court has recognized that "the family is the basic unit of our society, the center of the personal affections that ennoble and enrich human life. It channels biological drives that might otherwise become socially destructive; it ensures the care and education of children in a stable environment; it establishes continuity from one generation to another; it nurtures and develops the individual initiative that distinguishes a free people." ...

*Id.* at 457–59.

The Department of Employment brief relies upon a Utah case, *Chandler v. Department of Employment Security,* 678 P.2d 315 (Utah 1984), for the proposition that

that court held constitutional a statute similar to ours. This is true; that court did do so, but such is merely of passing interest. Rita Carlson raises no constitutional issues, and moreover it could be said of *Pyeatt* that this Court passed on the constitutional issues. At least, it is seen that our publisher, West Publishing Company, thinks so. *See Pyeatt, supra,* 98 Idaho at 424, 565 P.2d at 1381, headnotes 3, 4, and 5. My own gratuitous constitutional thought is appended.

What should have been brought to our attention by the Department is that Justice Durham, the author of the constitutional determination in *Chandler,* wrote in much the same vein as the *MacGregor* court concerning a leaving of employment which is voluntary, and a leaving which is not voluntary because it is induced by *compelling circumstances.* In *Chandler,* it must be first observed, the Utah court dealt with six consolidated cases all similar to *Pyeatt* in that the family units involved *no* children. In considering the Utah statute, § 35–4–5(a) of U.C.A. (1983 Pocket Supp.), which states in part: "An individual is ineligible for benefits .... Notwithstanding any other provision of this section, a claimant who has left work voluntarily to accompany, follow or join his or her spouse to or in a new locality does so without good cause for purposes of this subsection," Justice Durham wrote:

> By its plain language, the statute before us requires that (a) the claimant must *voluntarily* leave work and that (b) the reason for the claimant's leaving work be "to follow or join a spouse in a new locality." These requirements have been misconstrued in these cases. Without exception, the initial eligibility form and/or the findings of the appeals referee for each claimant state that *because* the claimant left work to follow her spouse, the claimant left work "voluntarily without good cause." In other words, the statute has been interpreted as if it said "a claimant who has left work to

accompany, follow or join his or her spouse ... does so *voluntarily* without good cause." To the contrary, the word "voluntarily" modified the word "left" in the statute. Thus, *the statute itself requires evidence that the claimant (a) voluntarily left work* (b) in order to follow or join a spouse in a new locality, *before benefits may be denied* under the amended portion of § 35–4–5(a).

Other states have enacted statutes that specifically disqualify from benefits those claimants who leave work in order to follow a spouse to a new locality. The statutes vary widely in detail and application but, with a single exception, have been upheld as valid by the state courts. *See* 21 A.L.R. 4th 317 (1983). New York is a state that, like Utah, has a statute which provides for disqualification from benefits when a claimant leaves work *voluntarily* to follow a spouse. The New York Unemployment Insurance Appeal Board makes a factual determination *of whether the claimant's job separation was voluntary or whether there was a "compelling necessity for the claimant's physical presence in another locality,"* such as a physical disability in either the claimant or the claimant's spouse. *Ost v. Catherwood,* 26 A.D.2d 979, 274 N.Y.S.2d 691, 692 (1966). In *Richards v. Unemployment Compensation Board of Review,* 491 Pa. 162, 420 A.2d 391 (1980), the Pennsylvania Supreme Court considered whether a claimant had left work to follow her spouse to a new locality or whether she had some other *compelling* reason for separation. The court determined that the Board had read the statute too narrowly, and that although a desire to join her spouse may have been one factor in motivating her decision to relocate, *the record showed that her resignation and relocation were "compelled by economic necessity," including the inability of the two spouses to support separate households.* Id. 420 A.2d at 395.[3]

---

**3.** Rita Carlson deftly drove home that very same point in championing the right, or better, the duty, to keep intact their family unit.

In applying the Utah statute to the claimants in the instant cases, we should construe the word "voluntary." Section 35-4-5(a)b makes it clear that a termination of employment initiated by the employee rather than the employer—does not necessarily make a claimant ineligible for benefits. The standard is whether the claimant left work "voluntarily without good cause." The General Rules of Adjudication of the Utah Department of Employment Security at Voluntary Leaving, § 210, states:

"Good cause" as used in unemployment insurance cause which would justify an employee's voluntarily leaving work and becoming unemployed .... To constitute good cause, the circumstances which compel the decision to leave must be real, not imaginary; substantial, not trifling; and reasonable, not whimsical. *There must be some compulsion from outside and necessitous circumstances.*

Quoted in *Child v. Board,* 657 P.2d [1375] at 1376 [(1983)] (emphasis in original).

It would not be appropriate under the statute to exclude from benefits persons who leave employment with good cause (including injury, illness, economic necessity and job harassment) and end up, coincidentally, with a spouse in a new locality, even though the *reason* for leaving is not "to accompany, follow, or join his or her spouse." The plain language of the statute covers only persons who leave employment *for the sole or primary purpose of* being with a spouse. An analysis of the "voluntariness" of the decision to leave permits an assessment of this element of the decision to leave work.

The records in three of the cases before this Court clearly show that the reason for claimants' leaving work was "compulsion from outside and necessitous circumstances." Claimants York, Chandler and Nagel left their jobs when their husbands' employers transferred them to new localities. Had the claimants remained employed in Utah, they would have been required to maintain separate households, a financial burden that would have defeated the very purpose of their employment. The record indicates that neither these claimants nor their husbands had any choice in when or where to relocate; the choice was made by the husbands' employers. In each of these three cases, the determination was made that the claimant quit to joint her spouse and *therefore* that the claimant quit "voluntarily without good cause." In none of these cases was there a proper finding of voluntariness as required by the statute, although in each case the evidence supports a finding that the claimant did *not* quit "voluntarily." *To deny unemployment compensation to these claimants would defeat the purpose of unemployment compensation, which is to ease the hardship of those who become unemployed through no fault of their own.*

*Chandler, supra,* 678 P.2d at 318–20 (emphasis added).

Mr. Weeks, in arguing orally for the Department, came very close to the right answer in this case—so close in fact that one would choose to believe that the Department of Employment legal staff on due consideration and reflection would have even more nobly recognized Rita Carlson's entitlement than to continue its resistance—certainly not made on behalf of her employer. I submit pertinent portions of Mr. Weeks' oral presentation:

"In this particular case, the claimant, Mrs. Carlson, was employed in a clerical capacity earning $1,000 a month at the time of her separation from employment. She was employed by the Center of Resources for Independent People from March 1980 until August 31, 1982, at which time she resigned. There is no indication in the record of any employment-related difficulties. There is no indication from the claimant that her separation was for any reason other than to accompany her spouse who had obtained employment in California and she expressed a desire to be with him *and they apparently have two teenage chil-*

*dren who she felt provided some cause for them to rejoin as a family unit.* She stresses this throughout all the material she submitted and throughout all of her testimony. *Obviously the Department has no argument with her position that the family unit is a very important and very significant social cause to leave employment. Unfortunately for Mrs. Carlson, the Department also feels that the legislature has been rather explicit about this particular disqualification and it appears to the Department and to myself that she fits squarely within this disqualification.*

"Now at the time she moved to California, left the state, she had no employment opportunity available to her down there, at least according to her own testimony, and was in fact unemployed two months later in October of 1982 when she filed an interstate claim for benefits in Los Angeles County. At that time her husband was employed and she had insisted throughout the proceedings that he, of course, was the main source of earnings for this particular family. Procedurally, Mrs. Carlson has been denied benefits through each and every level of this appeal, finally culminating in this Court's decision filed October 22, 1984, which affirmed those disqualifications. There was no hearing held at the Industrial Commission level. They do not do telephone conferences as do the appeals bureau of the Department. Mrs. Carlson understandably was unable to come to Idaho specifically for a hearing and chose not to. The Industrial Commission therefore simply adopted the findings and conclusions of the appeals examiner in this case.

"... This Court has consistently held that personal eligibility conditions under the unemployment security law, are pursuant to statute. There is a very elaborate statutory scheme, as the Justices know, for determining eligibility and monetary eligibility as well for benefits. In my brief on rehearing, I pointed out that this particular statutory disqualification is similar to many found in other states, and for the most part most states have similar statutory methodologies for determining eligibility. It's

not too dissimilar because the Federal Department of Labor requires some conformity to their requirements. In this particular case, though, *the states do have some latitude and the federal government has not mandated this as a specific disqualification....*

"... We look at the statute and the Department regulations and see whether in fact the claimant is eligible under the statute. I suppose that our main concern is to be reporting to the legislature, who in fact puts this whole scheme together, rather than to the employers who were mandated to participate in it whether they want to or not. So, you're correct in a sense that we wouldn't pay that much attention to an employer flatly saying we don't care whether this claimant gets benefits. In fact, the statutes prohibit collusion, as it were, between the employer and the claimant to obtain benefits when there in fact should be an issue noted, and we have had some difficulties with things like that.

"JUSTICE BISTLINE: Well, yes, collusion would be bad. But what about an employer such as this one that is well acquainted with the facts and circumstances, is the employer whose percentage may even go up, as it sometimes happens, and this employer says this is a just case. There are children involved here. The husband had to leave the state—not voluntarily on his part like it might have been, like in the *Pyeatt* case. That was entirely voluntary, that husband came to Boise because he could get a better job and more money. In this case you had a totally unemployed person who beat the sagebrush to death up and down the state of Idaho looking for employment and was finally forced out of the state to California, where he finally found employment. Then, as the employer agreed with the claimant, it was just and proper that when he got located and had a source of money that the family should be reunited. So that basically you're saying that under the scheme of things you're not allowed to be concerned with such things as that.

"MR. WEEKS: The converse would be true also. If the employer in this particular case had come into the hearing and said we absolute opposed granting benefits to this claimant—

"JUSTICE BISTLINE: As they often do.

"MR. WEEKS: They often do. We simply wouldn't pay that much attention to what the employer was saying because we have a rather clear statute—we have a clear set of facts—that the employer really has no influence over.

"JUSTICE BISTLINE: You're saying really that you're a trustee-your're the one that used the word—of other people's money, but you're not beholden to their thinking in either respect?

"MR. WEEKS: Precisely, except insofar as they can lobby their legislators to amend certain provisions of the act.

"JUSTICE BISTLINE: Now, while you're on the legislation, I assume it's too late at this time go back and wonder who drafted this particular statute and put it in this particular language, without any concern whatever for family units—as you used the language yourself a few minutes ago?

MR. WEEKS: First of all, *I personally have some clear policy problems of my own with this particular statute. It's not one that I personally would have drafted. I'm not sure it's a really good idea in an overall social sense.*

"JUSTICE BISTLINE: I think it crept out a few minutes ago when you were opening, which wasn't mentioned in the first hearing by the Department, that this was a family unit being reunited, and then in your research you found a California case which says 'who cares?' about family units.

"MR. WEEKS: Well, the California Supreme Court seems to go into their own definitions of what is a family unit, although I'm still unclear about how they got around their statute which specifically says 'spouse.'

JUSTICE BISTLINE: You're talking about the *MacGregor* case?

"MR. WEEKS: Yes, I am.

"JUSTICE BISTLINE: Yes, but, forgetting that, we don't have that situation here. Here we have genuine parents and genuine children.

"MR. WEEKS: Indeed.

'JUSTICE BISTLINE: We have husband married to wife, wife married to husband. So we're not concerned with that aspect of the California case. In looking at that case you had to come cross the *Van Burgh* case, an old California case which was quoted at length. It talks about back in the days when the family was a family always, how important it is as a matter of public policy. That old California case says, as I remember it, that as a matter of public policy we will put the stamp of approval upon no law which is destructive of the family unit.

"MR. WEEKS: I've seen that case cited, Mr. Justice Bistline, I haven't read it specifically. As to Idaho's intent in that statute, as I'm sure you're aware, it's pretty difficult to determine legislative intent from anything that's published. I don't know specifically what triggered a response in the legislature to enact this particular statute.

"JUSTICE BISTLINE: I know what you're talking about. You can almost imagine what happened. Some employer had a couple of young girls who took up with traveling salesmen and all of a sudden left to go live in California and his contribution went up. Because *the statute, as I read it, is primarily directed at that situation.* And, of course, they don't have any children. *Children, of course, as you have noted yourself, are not mentioned in the statute.*

"MR. WEEKS: Correct.

"JUSTICE BISTLINE: Completely ignored. This is certainly a failure upon the part of the statute, one would think.

"MR. WEEKS: In my research I came across the Oregon statutory scheme. Our sister state has decided apparently not to address it specifically, not to make it a

specific disqualification, but to rely, instead, upon the basic good cause requirements for any voluntary quit. I'm not sure exactly how that works out procedurally in Oregon, but it's certainly kind of a middle ground between California, which is exactly the opposite, where they say it may be deemed to be good cause based upon their policy, and between Utah and Idaho's, which is the opposite of that, in that it at no time is going to be good cause.

"JUSTICE BISTLINE: I would like to mention, so you'll have something to think upon when you return to Boise, you might even want to write a little supplement and offer it up to us, but this case from California was—a very applicable passage was quoted, approved and adopted by the Idaho Supreme Court probably, I don't know, twenty, twenty-five years ago. The name of the case escapes me now, but it's easily found by Shepardizing the case. You'll find when the Idaho Court picked it up. But I think that is law. I think *it made law in Idaho that's still law that the family unit must be preserved.* The legislature didn't touch upon it. All that teaches me, so you'll get my point of view, is that the legislature—we're always finding fault with their statutes, medical indigency especially, this is very complicated law that you people have to work with—but they obviously didn't give any concern to the family unit because nobody thought about it. The *Pyeatt* case, no kids involved. Just husband and wife, and husband employed, not unemployed, just looking for a better job. So you can see that *this would kind of worry me a little bit about our earlier decision that went out.*

"MR. WEEKS: *Certainly, and it does me too. I'd be surprised if the Idaho Supreme Court weren't concerned about issues like that. I'm pleased that you are, as a matter of fact.* But, unfortunately, I have what appears to be a fairly clear statute here that doesn't take into account any considerations other than the ones mentioned there. That is that you leave to accompany a spouse.

"JUSTICE BISTLINE: Two spouses. *It talks about the two spouses and doesn't consider a family unit that includes children.*

"MR. WEEKS: *Correct. Yes. Maybe not correct, but true.*

"JUSTICE BISTLINE: I like your approach.

"MR. WEEKS: Anyway, the Oregon approach makes sense to me, but I don't draft legislation and I don't have a whole lot of influence on what does get passed over there. We're sort of in a position of sitting back and seeing what the legislature wants us to do.

"JUSTICE BISTLINE: Excuse me, I didn't mean to cut off. Do you have any influence on what gets submitted to the legislature?

"MR. WEEKS: I do have some influence. And *this particular case has been noted by the Department and the Industrial Commission,* in fact, and I'm trying not to testify here, but as a matter of fact, *the Industrial Commission has problems with it too.* I think they'd like to see it changed, to make it a good cause type of standard. In some cases *this would probably be obviously good cause for quitting employment but for that specific disqualification.* As I mentioned at the beginning of my argument here, *the examiners simply don't go into those good causes when they see this* specific enactment. *They simply stop right there and say well, okay, that's all we have to look at.*

"JUSTICE BISTLINE: I think we all appreciate that. That's something that probably the Commission can't do either. *But I think we can do it if we are of such a disposition.* (Emphasis added.)

As I intimated above, the Department came perilously close to ascertaining the correct result and conclusion to this case when its research done on rehearing brought it into close contact with California's *MacGregor* case and Utah's *Chandler* case, with discussion in each as to public policy, compelling circumstances *vis a vis* a voluntary quit—especially where, as here,

uniquely, the compelling circumstances were to reunite a family which included minor children.

Had the Department notified this court that on renewed research and enlightened reflection it had concluded that neither *Pyeatt* nor the I.C. § 72–1366(d), precluded it from recognizing Rita Carlson's entitlement, that good news would have resulted in this Court's disengagement from the controversy. Instead, I greatly fear that the Court issues an opinion this day which does not accurately portray the Court's usual levels of intellect and integrity.

The Department, however, is entitled to be recognized for advancing the thought that the legislature's statute is not compatible with sound public policy. Even now it may be drafting the legislation which it believes necessary to attain that goal. Hopefully it will also request the enactment of a Rita Carlson Relief Bill, which will make amends for this Court's summary resolution of the appeal, and the majority's recalcitrance on rehearing.

To my mind, however, corrective legislation is not required. There is nothing in the present legislation which stands in the way of this Court doing that for which courts are constituted—achieving justice. *Pyeatt* is readily distinguishable. *Pyeatt* fits in with some of those cases whereof Justice Durham wrote that benefits could not be paid under a similar statute. All of those cases, as with *Pyeatt*, involved no minor children in the family unit.

Neither the legislature of Idaho nor the legislature of Utah has ever passed legislation which was aimed at the destruction of a family unit which includes minor children. There are not any states in the Union with more regard for such family units than Idaho and Utah.

When I review the names of the 1947 legislators[4] who first enacted § 72–1366(c), and those legislators (some the same) who later dealt with 1965 and 1971 amendments, I see the name of not one person who would have voted yea to a bill that would later be so grossly misperceived as a

legislative directive that the intended benefits of social legislation would be denied to an employee who voluntarily, even eagerly, left her own employment to reunite a family of four, even had not the husband been forced out of Idaho by a labor market over which he had not control. The legislature is not at fault. *There is no statute governing Rita Carlson's circumstances.* The Department of Employment in the first instance, the Commission in the second, and this Court finally, are confronted with no obstacle precluding an award of benefits.

*Compelling circumstances* are self-evident where a husband-father has been forced out of Idaho in order to find employment, and his wife leaves her employment in Idaho to reunite the family, including two minor children. Such cannot be considered a *voluntary* action on the part of the wife as being within the disqualification of the statute.

That eight-line passage could and should have been our short per curiam opinion— long ago. Those justices who comprise the majority, and do not deign to write one word in response, do little to advance the science of jurisprudence. On other occasions, in this Court and others, separate views are not accorded such disdainful treatment.

HUNTLEY, J., concurs.

### APPENDIX A

An additional issue not considered by the majority is the combined effect of the statute in question, as applied by today's majority, has upon Mrs. Carlson's constitutional right of interstate travel. That right has repeatedly been recognized as a basic constitutional right. *Memorial Hospital v. Maricopa County*, 415 U.S. 250, 254, 94 S.Ct. 1076, 1080, 39 L.Ed.2d 306 (1974); *Dunn v. Blumstein*, 405 U.S. 330, 335, 92 S.Ct. 995, 999, 31 L.Ed.2d 274 (1972); *Shapiro v. Thompson*, 394 U.S. 618, 629, 89 S.Ct. 1322, 1328, 22 L.Ed.2d 600 (1969). As the United States Supreme Court stated in *Maricopa County, supra,* and *Shapiro,*

---

4. See Appendix B.

*supra,* the right to travel incorporates the rights "to migrate, resettle, find a new job, and start a new life." *Shapiro, supra,* 394 U.S. at 629, 89 S.Ct. at 1328, quoted in *Maricopa County, supra,* 415 U.S. at 255, 94 S.Ct. at 1080.

Applying the law as the majority does today will keep all future Rita Carlsons locked in Idaho until they have drawn their entitlement, hardly in keeping with the policy pronouncement of a more enlightened earlier Court in *Howay, supra.* Pitting a constitution against a misinterpreted statute, it would seem that Rita Carlson and her family would prevail. However, a decision of constitutional dimension is not this day required—where ordinary reading skills and some proficiency in the English language should carry the day.

## APPENDIX B

# SENATE JOURNAL
### OF THE
# IDAHO LEGISLATURE

## TWENTY-NINTH SESSION

### MONDAY, FIRST LEGISLATIVE DAY

#### JANUARY 6, 1947

Senate Chamber, Boise, Idaho,
January 6, 1947.

At the hour of 12 o'clock noon on Monday, January 6, 1947, the day and hour fixed by the Constitution for the convening of the Legislature of the State of Idaho, the members-elect of the Senate of the Twenty-ninth Session of the Legislature convened in the Senate Chamber in the Capitol Building in the city of Boise and the Senate was called to order by President Pro Tempore Williams.

Whereupon the following certificate of election was read by Carl C. Kitchen:

STATE OF IDAHO
DEPARTMENT OF STATE

I, IRA H. MASTERS, Secretary of State of the State of Idaho and legal custodian of the record of elections held in the State of Idaho, and appointments made by the Governor of said State do hereby certify that the following is a full, true and complete list of those elected or appointed to serve as members of the Senate of the Twenty-ninth Session of the Idaho Legislature, as shown by the official records on file in my office:

| County | Name |
| --- | --- |
| Ada | Fred M. Taylor |
| Adams | Marguerite Campbell |
| Bannock | Nellie Cline Steenson |
| Bear Lake | D. E. Haddock |
| Benewah | A. R. McCabe |
| Bingham | J. E. Williams |
| Blaine | Lawrence F. Heagle |
| Boise | A. F. Baumhoff |
| Bonner | Glenn E. Bandelin |
| Bonneville | Fred Gustafson |
| Boundary | John B. Thompson |
| Butte | E. J. Soelberg |
| Camas | John H. Bahr |
| Canyon | Edson H. Deal |
| Caribou | Frank W. Harris |

| County | Name |
| --- | --- |
| Cassia | Charles C. Haight |
| Clark | Earl S. Wright |
| Clearwater | Leonard K. Floan |
| Custer | R. T. Greene |
| Elmore | O. E. Cannon |
| Franklin | W. Stewart Geddes |
| Fremont | E. Deane Orme |
| Gem | W. C. Nichols |
| Gooding | Dale Cady |
| Idaho | George R. Chase |
| Jefferson | James E. Ririe |
| Jerome | Ralph E. Shawver |
| Kootenai | Chris Roholt |
| Latah | William C. Moore |
| Lemhi | Clyde Starr |
| Lewis | Perry W. Mitchell |
| Lincoln | F. L. Manwill |
| Madison | James E. Graham |
| Minidoka | Charles Collin |
| Nez Perce | Harry Wall |
| Oneida | D. P. Jones |
| Owyhee | Baldwin F. Brown |
| Payette | James H. Young |
| Power | Vard W. Meadows |
| Shoshone | W. H. Herrick |
| Teton | O. J. Buxton |
| Twin Falls | Carl D. Irwin |
| Valley | Carl E. Brown |
| Washington | Wm. Carson |

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed the Great Seal of the State. Done at Boise City, the Capitol of Idaho, this 4th day of January, in the year of our Lord one thousand nine hundred and forty-seven, and of the Independence of the United States of America, the One Hundred and Seventy-First.

(The Great Seal of the State of Idaho)

IRA H. MASTERS,
Secretary of State.

Roll call for the purpose of determining the number of Senators-elect present showed all members present, except Senator Ririe, excused.

There being a quorum present, the Senators-elect proceeded to the Hall of the House of Representatives for the purpose of taking the oath of office.

### Joint Session

House of Representatives, Boise, Idaho,
January 6, 1947.

The members-elect of the Twenty-ninth Session of the Idaho Legislature assembled in the Capitol Building, City of Boise, Idaho, with Speaker Moffatt presiding.

Prayer was offered by Reverend Herald G. Gardner.

The oath of office was administered to the following state officers by Chief Justice Alfred Budge of the Supreme Court:

Governor—C. A. Robins.

Lieutenant Governor—Donald S. Whitehead.

# HOUSE JOURNAL

### OF THE

## IDAHO LEGISLATURE

## TWENTY-NINTH SESSION

### MONDAY, FIRST LEGISLATIVE DAY

### JANUARY 6, 1947

House of Representatives,
Boise, Idaho, January 6, 1947.

### MORNING SESSION

The hour of noon having arrived, the hour designated by the Constitution for the convening of the Legislature of the State of Idaho, the House of Representatives was called to order by Honorable Willis C. Moffatt, Speaker of the Twenty-eighth Session.

At this time Mr. Paul Davis, Chief Clerk of the Twenty-eighth Session, read the following Certificate of Election:

### STATE OF IDAHO
### DEPARTMENT OF STATE

I, IRA H. MASTERS, Secretary of State of the State of Idaho and legal custodian of the record of elections held in the State of Idaho, and appointments made by the Governor of said State, do hereby certify that the following is a full, true and complete list of those elected or appointed to serve as members of the House of Representatives of the Twenty-ninth Session of the Idaho Legislature, as shown by the official records of the State of Idaho:

| County | Name |
| --- | --- |
| Ada | David G. Tate |
| Ada | Jess B. Hawley, Jr. |
| Ada | Paul Vernon |
| Ada | W. D. Vincent |
| Adams | Edwin Snow |
| Bannock | Mathias W. Lowe |
| Bannock | J. O. Anderson |
| Bannock | Henry C. O'Leary |
| Bear Lake | Leland Tufts |
| Benewah | L. Cotty Lowry |
| Bingham | Leo D. Murdock |
| Bingham | J. S. Gardner |
| Blaine | Anthony Bonin |
| Boise | Robert R. Mills |
| Bonner | J. C. Cranston |
| Bonneville | Lyle Anderson |
| Bonneville | Russell Everett |
| Boundary | J. R. Meeker |
| Butte | T. C. Waddoups |
| Camas | Harry Durall |
| Canyon | Erwin H. Schwiebert |

| County | Name |
|---|---|
| Canyon | Chester C. Minden |
| Canyon | Wallace B. Keim |
| Caribou | Heber Lau |
| Cassia | Charles S. Clark |
| Clark | Gus E. Brauer |
| Clearwater | Harry Krumsick |
| Custer | Edith Taylor |
| Elmore | Helen J. Miller |
| Franklin | Roy C. Andreasen |
| Fremont | Raymond H. Hawkes |
| Gem | Nora L. Davis |
| Gooding | Julius Schmitt |
| Idaho | L. B. Jordan |
| Jefferson | Paul C. Holm |
| Jerome | John Hohnhorst |
| Kootenai | A. B. Lafferty |
| Kootenai | Jesse Vetter |
| Latah | Wayne Hampton |
| Latah | W. L. Mills |
| Lemhi | L. N. Gwartney |
| Lewis | W. E. Drevlow |
| Lincoln | Willet B. Whittekiend |
| Madison | Sterling Magleby |
| Minidoka | Tom Bell |
| Nez Perce | Howard D. Hechtner |
| Nez Perce | Bert Schroeder |
| Oneida | Keith M. Budge |
| Owyhee | Victor Ford |
| Payette | H. Grant Gardner |
| Power | H. C. Allen |
| Shoshone | W. Rex Westcott |
| Shoshone | Floyd L. Warner |
| Teton | Richard A. Egbert |
| Twin Falls | Charles L. Busmann |
| Twin Falls | Charles W. Coiner |
| Twin Falls | Barney Glavin |
| Valley | F. H. Wallace |
| Washington | Arthur Wilson |

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed the Great Seal of the State. Done at Boise City, the Capitol of Idaho, this Fourth day of January, in the year of our Lord one thousand nine hundred and forty-seven, and of the Independence of the United States of America, the One Hundred and Seventy-First.

(Signed) IRA H. MASTERS,
Secretary of State.

Roll call showed all members present.

## Joint Session

State officials-elect of the Twenty-ninth Session were ushered into the House of Representatives at this time, for the purpose of being inaugurated into office.